UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANYSA NGETHPHARAT,
individually, and JAMES KELLEY,
individually and on behalf of those
similarly situated,

Plaintiffs,

v.

STATE FARM MUTUAL
INSURANCE COMPANY, STATE
FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY,

Defendants.

CASE NO. C20-454 MJP

ORDER ON PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION

This matter comes before the Court on Plaintiffs' Motion for Class Certification. (Dkt. No. 74.) Having reviewed the Motion, the Opposition (Dkt. No. 83), the Reply (Dkt. No. 97), the Surreply (Dkt. No. 99), Plaintiffs' additional brief on Rule 23(g) (Dkt. No. 130), Defendants' Notices of Supplemental Authority (Dkt. Nos. 87, 135), and all supporting materials, and having held oral argument on the Motion on June 22, 2021, the Court GRANTS in part the Motion.

# BACKGROUND

This case involves Defendants State Farm Mutual Insurance Company's and State Farm Mutual Automobile Insurance Company's (together "State Farm") claims settlement process used to determine the actual cash value (ACV) of an insured's total loss vehicle. Plaintiffs Anysa Ngethpharat and James Kelley attack State Farm's practice of applying a "typical negotiation discount" to the comparable cars used to determine the ACV of an insured's total loss vehicle. This discount appears in reports prepared by a third-party Audatex, which are referred to as "Autosource Reports." Plaintiffs allege that valuations based on Autosource Reports with the typical negotiation discount violate Washington's insurance regulations. They pursue claims for: (1) breach of contract; (2) violation of the Washington Consumer Protection Act; and (3) declaratory and injunctive relief. (First Amended Complaint ¶¶ 6.3, 7.2, 8.1-8.3 (Dkt. No. 5).)

## A.    Regulatory Framework

The parties agree that a "necessary predicate" to Plaintiffs' claims is State Farm's alleged violation of WAC 284-30-391 ("Section 391"). (Def. Opp. at 8 (Dkt. No. 83 at 14).) The Court has already analyzed the regulatory framework of Section 391 in ruling on State Farm's Motion to Dismiss. (Order on Motion to Dismiss (Dkt. No. 49).) The Court reviews several pertinent aspects of that analysis to help frame the legal issues presented in the Motion.

Section 391 establishes the methods by which an insurer "must adjust and settle vehicle total losses" and the standards of practice for the settlement of total loss vehicle claims. WAC 284-30-391. The settlement methodology and standards of practice work in tandem and impose intertwined, but independent requirements on the insurer. Section 391 states that "[u]nless an agreed value is reached, the insurer must adjust and settle vehicle total losses using the methods set forth in subsections (1) through (3) of this section." WAC 284-30-391 (emphasis added). But

1     the insurer need follow just one of these three methods. At issue in this case is Section 391's

2     "cash settlement" methodology. This provision permits the insurer to "settle a total loss claim by

3     offering a cash settlement based on the actual cash value of a comparable motor vehicle, less any

4     applicable deductible provided for in the policy." WAC 284-30-391(2). Section 391(2) includes

5     two key provisions to determine actual cash value of a comparable motor vehicle. First, to

6     determine the actual cash value, "only a vehicle identified as a comparable motor vehicle may be

7     used." WAC 284-30-391(2)(a). Second, the insurer must "determine the actual cash value of the

8     loss vehicle by using any one or more of the following methods": (1) comparable motor vehicle;

9     (2) licensed dealer quotes; (3) advertised data comparison; or (4) computerized sources. WAC

10     284-30-391(2)(b)(i)-(iv).

11         Section 391 also "establish[es] standards of practice for the settlement of total loss

12     vehicle claims" which the "insurer must" follow. WAC 284-30-391(4). Relevant here is Section

13     391(4)(b), which says that the insurer must "[b]ase all offers on itemized and verifiable dollar

14     amounts for vehicles that are currently available, or were available within ninety days of the date

15     of loss, using appropriate deductions or additions for options, mileage or condition when

16     determining comparability."

17         In ruling on the Motion to Dismiss, the Court concluded that "[t]o give full effect to the

18     language of Section 391(2), the Court finds that the 'actual cash value' determination must

19     comply with the methodologies set forth in Section 391(2)." (MTD Order at 10.) "This

20     determines the 'fair market value' of a comparable vehicle, which is consistent with the general

21     definition of 'actual cash value' in Section 320." (Id.) The Court also held that Section 391(4)

22     provides the exclusive list of deductions that can be taken from the actual cash value

23     determination. (Id. at 12-13.) To comply with Section 391(4), any deduction must also be

24

1  itemized and verifiable. (Id. at 13-14.) In so holding, the Court defined the terms "itemized" and

2  "verifiable" as follows: "Merriman Webster defines the term 'itemized' as 'to set down in detail

3  or by particulars; list' and defines 'verifiable' as to be able to 'establish the truth, accuracy or

4  reality of.'" (Id. at 13 (citation and quotation omitted).)

5  **B.  Facts Relevant to the Named Plaintiffs**

6       The Court reviews the facts related to the settlement of Ngethpharat's and Kelley's total

7  loss claims to understand whether they may represent a class of similarly situated individuals.

8       After declaring Ngethpharat's car a total loss, State Farm offered her $13,378 as her car's

9  actual cash value, based on an Autosource Report using multiple comparable vehicles adjusted

10  for a "typical negotiation." (Declaration of Peter Herzog, Exs. 11 & 12 (Dkt. No. 85).) Through

11  counsel, Ngethpharat objected to the valuation and the negotiation discount, and provided her

12  own valuation proposal based on comparable vehicles she had identified. (Herzog Decl., Ex. 13.)

13  State Farm then "escalated" her claim and obtained a second Autosource Report based on two

14  dealer quotes which included no adjustment for a "typical negotiation." (Herzog Decl., Ex. 14.)

15  That second valuation was somewhat higher, at $13,948. (Id. at 2 (365).) When Ngethpharat

16  continued to object to the valuation, State Farm paid Ms. Ngethpharat $13,948, representing the

17  amount it did not dispute it owed her, which was the amount listed on the second Autosource

18  Report. (Expert Report of Paul Torelli ¶ 16 (Dkt. No. 75-1).)

19       Kelley had a somewhat different experience when State Farm settled his total loss claim.

20  After determining Kelley's vehicle to be a total loss, State Farm offered him $54,056 based on an

21  Autosource Report that used a single comparable vehicle with a typical negotiation discount

22  applied. (Herzog Decl. Ex. 15.) Kelley was then paid that same amount and he did not "escalate"

23  the claim as Ngethpharat did.

24

## C.    Facts Relevant to Class Certification

Plaintiffs assert that State Farm follows a uniform claims settlement practice through which it underpays its insureds' total loss claims by using an ACV determined in Autosource Reports that includes a typical negotiation discount applied to the comparable vehicles. The evidence bears this out. The typical claims handling process starts with a car inspection performed by a State Farm "estimator" or repair facility representative which leads to the creation of a Vehicle Inspection Report. (Declaration of Douglas Graff ¶¶ 11-12 (Dkt. No. 84).) This "triggers the valuation process" which includes obtaining an "Autosource Report" created by a third-party vendor called Audatex/Solara. (Id. ¶¶ 11-13.) From March 25, 2014 to the present, State Farm has used Autosource Reports to provide computerized ACVs on total loss claims. (Deposition of Douglas Graff at 29:7-20 (Dkt. No. 75-11).) Autosource Reports are used "99-plus percent of the time" when there is a total loss claim in Washington. (Id. at 32:16-21.) And absent rare circumstances (when no comparable vehicles are found or when the comparable vehicle either has a "sold" price or sold by a "no-haggle" dealer), the Autosource Report will apply a typical negotiation discount to the advertised price of the comparable vehicles. (Id. at 45:8-46:3; Declaration of Neal Lowell ¶ 15 (Dkt. No. 86).)

Once the claims handler has reviewed and "verified" the Autosource Report as to the condition, equipment, mileage, and options, they will reach out to the customer to discuss the valuation. (Graff Decl. ¶ 17.) Claims handlers do not provide insureds the Autosource Report as a matter of course—only if requested. (Id. ¶ 20.) If the insured contests the valuation, then the claims adjuster may change the valuation based on objective information from the insured and they can request an updated Autosource Report reflecting that new data. (Graff Decl. ¶¶ 20-22.) The claims file should note whether the claims adjuster specifically discussed the negotiation

discount and/or if the insured was sent the Autosource Report. (Graff Dep. 163:24-164:8; Deposition of Ellie Gray at 45:15-46:24, 47:14-50:2, 54:22-55:22 (Dkt. No. 75-14).) If the insured objects to the negotiation discount, State Farm will not "back out" the discount but will instead consider a two-dealer quote report. (Graff Dep. at 168:1-169:20.) Using anything other than the Autosource Report for the valuation requires management approval and documentation in both the claims file and State Farm's computer-searchable database. (Graff Dep. at 171:3-172:20, 202:1-13, 235:7-235:14, 245:3-247:4.) If the insured and State Farm cannot agree, then the next step is appraisal. (Graff Dep. at 172:21-175:6; 236:13-237:8.)

State Farm focuses much of its briefing on its contention that insureds often reach agreement on the value of the total loss claim, which is relevant to State Farm's theory of compliance with Section 391. According to State Farm, when an insured agrees to the value State Farm proposes, "the agreement is documented in the claim file." (Graff Decl. ¶ 23.) State Farm also sends a letter to the insured explaining the valuation and the total-loss settlement process, and it includes a release of interest/power of attorney. (Id. ¶ 24.) The sole example State Farm points to is found in the call notes in Faysal Jama's claim file (the plaintiff in the related matter—Jama v. State Farm, C20-652 MJP), which state:

> "RCF [Received Call From] Anna from the Law offices of Daniel Whitmore the NI's [Named Insured's] attorney's office stating the NI [Named Insured] wants to settle out the claim … Value Accepted (Y/N): Y."

(Graff Decl. ¶ 23.) The parties dispute whether this shows Jama agreed to the negotiation discount, and Jama argues that he merely sought payment without waiving his objection to the negotiation discount. State Farm has not provided evidence from the claim files of any insureds in the proposed class that the insured specifically and expressly agreed to the use of the typical negotiation discount being applied to reach the ACV.

Instead, State Farm relies heavily on a survey that its expert, John Lynch, Jr., conducted of a small sample of insureds and argues that class members frequently agree to the ACVs presented by State Farm. Lynch designed a survey of putative class members based on Plaintiffs' original class definition. Of the list of 60,689 claims, he found only 50,970 of the insureds had email addresses. (Expert Report of John Lynch, Jr. ¶ 14 (Dkt. No. 85-2).) After some testing, he ultimately sent a survey to 4,000 randomly-sampled individuals and only 10.7% completed (427) the survey. (Id. ¶ 22 and Ex. 5 to Lynch Report.) Through what looked like a communication directly from State Farm, Lynch's survey asked the following questions:

1. Did you call your State Farm insurance agent after your total loss accident?

2. Did you speak with a State Farm claim specialist after your total loss accident?

3. Were you satisfied or dissatisfied with the speed of the final settlement you received from State Farm?

4. Were you satisfied or dissatisfied with the amount of the final settlement you received from State Farm?

5. Did you tell State Farm that you disagreed with the dollar value of the settlement for your totaled vehicle?

6. When you made your total loss claim, did you do your own research to figure out the fair market value of your vehicle?

7. What sources did you consult to figure out the fair market value of your vehicle just prior to your accident? Select all that apply

8. When you replaced your totaled vehicle, did you negotiate the price of the replacement vehicle you purchased or leased?

(Dkt. No. 85-2 at 9-10.) The results showed that 81.7% of the people polled stated they were satisfied with the amount of the final settlement, but 20.6% stated they disagreed with the dollar value of the settlement. (Lynch Report ¶ 24.) Absent from the survey are any questions about whether the recipient agreed with the value State Farm came up with for the loss vehicle, whether the person knew about the typical negotiation discount, whether the insured agreed with

the typical negotiation discount, or whether the typical negotiation discount was applied to the insured's claim. Lynch initially did not determine what portion of the respondents are current or former insureds. His supplemental declaration states that the reporting rate was slightly higher for current insureds, but that the no differences in "satisfaction or in any other survey measure" as between the two population. (Declaration of John Lynch in Opposition to Plaintiffs' Motion to Exclude ¶ 4 (Dkt. No. 114-4).)

**D.      Proposed Class Definition**

Plaintiffs seek to certify the following class:

> All STATE FARM [Mutual] insureds with Washington first party personal line policies issued in Washington State, who received compensation for the total loss of their own vehicles under their First Party (Comprehensive, Collision, and UMPD) coverages, and who received a total loss valuation from Audatex based upon the value of comparable vehicles which took a deduction/adjustment for "typical negotiation."

> Excluded from the Class would be (a) the assigned Judge, the Judge's staff and family, and State Farm employees; (b) claims for accidents with dates of loss occurring before March 25, 2014; (c) claims where the total loss was on a "non-owned" (borrowed or rented) vehicles; and (d) claims where the insured submitted written evidence supporting a different valuation, and the amount of that different valuation submitted by the insured was paid by State Farm to settle the total loss.

(Mot. at 1-2 (Dkt. No. 74).)

## ANALYSIS

**A.      Class Certification Standard**

Courts must undertake a "rigorous analysis" of all the Rule 23 factors to determine whether to certify a class. <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 351 (2011). The plaintiff must first meet all four requirements in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. <u>See</u> <u>Leyva v. Medline Indus.</u>, 716 F.3d 510, 512 (9th Cir. 2013); Fed. R. Civ. P. 23(a). The plaintiff must also satisfy one of the Rule 23(b) factors. Here Plaintiff seeks certification under the "predominance" standard of Rule 23(b)(3). "To obtain certification

of a class action for money damages under Rule 23(b)(3)," a putative class must also establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members." <u>Amgen Inc. v. Conn. Ret. Plans & Tr. Funds</u>, 568 U.S. 455, 460.

Plaintiffs must demonstrate predominance and superiority under Rule 23(b)(3) by a preponderance of the evidence fits Rule 23(b)(3). <u>See</u> <u>Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC</u>, 993 F.3d 774, 784 (9th Cir. 2021). "Establishing predominance, therefore, goes beyond determining whether the evidence would be admissible in an individual action" and "[i]nstead, a 'rigorous analysis' of predominance requires 'judging the persuasiveness of the evidence presented' for and against certification.'" <u>Id.</u> at 785-86 (quoting <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 982 (9th Cir. 2011)). And in ruling on a motion for class certification "[c]ourts must resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits." <u>Id.</u> at 784 (citing <u>Wal-Mart</u>, 564 U.S. at 351).

**B.      Rule 23(a)(1): Numerosity**

Numerosity exists when "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." <u>Gen. Tel. Co. of the Nw. v. Equal Emp. Opportunity Comm'n</u>, 446 U.S. 318, 330 (1980). Here, State Farm does not contest numerosity or Plaintiffs' allegation that there are over 34,000 insurance claims that could fall within the proposed class definition. And during oral argument, Plaintiffs' counsel identified over 58,000 people in the class definition as revised by the Court and explained below. This is

1  sufficient to show numerosity, which can be shown using reasonable estimates. <u>See</u> <u>In re Badger</u>

2  <u>Mountain Irrigation. Dist. Sec. Litig.</u>, 143 F.R.D. 693, 696 (W.D. Wash. 1992).

3  **C.      Rule 23(a)(2): Commonality**

4       Rule 23(a)(2) requires that there be "questions of law or fact common to the class."

5  "Commonality requires the plaintiff to demonstrate that the class members have suffered the

6  same injury." <u>Wal-Mart</u>, 564 U.S. at 349–50 (citation and quotation omitted). To satisfy

7  commonality, the claims must depend on a common contention "that is capable of classwide

8  resolution." <u>Id.</u> at 350. "What matters to class certification . . . is not the raising of common

9  'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate

10  common answers apt to drive the resolution of the litigation." <u>Id.</u> (quotation and citation

11  omitted). "Dissimilarities within the proposed class are what have the potential to impede the

12  generation of common answers." <u>Id.</u> (quotation and citation omitted).

13       **1.      Plaintiff's proof of commonality**

14       The primary common contention that can be resolved on a classwide basis is whether

15  State Farm is permitted to settle total loss claims with a typical negotiation discount. Resolution

16  of this question will be common to the class of persons paid a value determined in an Autosource

17  Report with the negotiation discount applied. If the Court finds the negotiation discount either

18  permissible or not, then all of the class members' claims will be resolved on a classwide basis.

19  This is also true of Plaintiffs' claims premised on the theory that the negotiation discount is not

20  "verifiable" as required by Section 391(4)(b). Based on the Court's review of the Autosource

21  Report examples filed to date, it appears that the disclosures and descriptions of the typical

22  negotiation is uniform, and its verifiability (or lack thereof) can be resolved on a classwide basis.

23

24

The only problem with regard to the above-identified commonality is the proposed class definition, which includes insureds who were not paid the amount determined in an Autosource Report with the typical negotiation discount applied. This includes Ngethpharat, who disputed an initial Autosource Report that included the negotiation discount, and was then paid an amount determined by a second Autosource Report that lacked a negotiation discount. While Plaintiffs suggest the two-dealer quote was "invalid" (Mot. at 16), they provide no explanation of why it violates Section 391 or how this could be proved with common evidence as to a class of similarly-situated individuals. Plaintiffs try to gloss over this by suggesting that Ngethpharat's total settlement was still less than what she would have received on the first Autosource Report if the negotiation deduction was not taken. But this appears legally irrelevant since Ngethpharat was paid using a different valuation methodology that Plaintiffs have failed to demonstrate is impermissible. And State Farm correctly argues that Plaintiffs have not shown how damages could be correctly calculated for Ngethpharat using a refund of the negotiation discount that was never applied to the payment she received. (Def. Opp. at 14.)

This lack of commonality as to Ngethpharat and those who also "esclatated" their valuations is not fatal to Plaintiffs' class certification request. "[W]hen a class definition is not acceptable, judicial discretion can be utilized to save the lawsuit from dismissal." 3 Newberg on Class Actions § 7:27 (5th ed.); see Campbell v. PricewaterhouseCoopers, LLP, 253 F.R.D. 586, 594 (E.D. Cal. 2008), adhered to, 287 F.R.D. 615 (E.D. Cal. 2012) ("[C]ourts retain the discretion to alter an inadequate class definition."). Rather than deny class certification, the Court finds it appropriate to revise the class definition to include only those paid the value determined in an Autosource Report with the negotiation discount applied. This excludes Ngethpharat and 455 other similarly-situated insureds (see Plaintiff's Presentation at Oral Argument (Dkt. No.

133 at 2)), but maintains what is otherwise a class of over 58,000 individuals, (see id.). By so narrowing the class, the Court ensures that the legality of the negotiation discount can be resolved on a classwide basis. While Ngethpharat cannot then serve as a class representative, she may still pursue her individual claims. The Court therefore revises the class definition as follows:

> All STATE FARM [Mutual] insureds with Washington first party personal line policies issued in Washington State, who received compensation for the total loss of their own vehicles under their First Party (Comprehensive, Collision, and UMPD) coverages, and whose claim was settled and paid using the amount determined by a total loss valuation from Audatex based upon the value of comparable vehicles which took a deduction/adjustment for "typical negotiation."

> Excluded from the Class would be (a) the assigned Judge, the Judge's staff and family, and State Farm employees; (b) claims for accidents with dates of loss occurring before March 25, 2014; (c) claims where the total loss was on a "non-owned" (borrowed or rented) vehicles; and (d) claims where the insured submitted written evidence supporting a different valuation, and the amount of that different valuation submitted by the insured was paid by State Farm to settle the total loss.

The Court also notes that State Farm was presented with an opportunity to discuss this revised definition during oral argument.

### 2. State Farm's arguments against commonality

State Farm claims that there are three flaws as to commonality, which the Court addresses below. State Farm also attacks the issue of damages in the context of commonality and predominance under Rule 23(b)(3). The Court separately addresses those concerns in the context of its predominance analysis in Section F(2).

### a. Agreed Value

State Farm argues that Plaintiffs cannot prove liability with common evidence because each claim will need to be examined to determine whether the insured "agreed" to the value. (Def. Opp. at 8-10 (Dkt. No. 83).) State Farm argues Section 391 "expressly allows an insurer and insured to reach an 'agreed value' based on any methodology" and that this necessitates mini-trials on whether each insured's reached an agreement as to value. (Id. at 8-10.)

To understand this argument, the Court reviews the relevant portion of Section 391, which states:

> Unless an agreed value is reached, the insurer must adjust and settle vehicle total losses using the methods set forth in subsections (1) through (3) of this section. Subsections (4) through (6) of this section establish standards of practice for the settlement of total loss vehicle claims. If an agreed value or methodology is reached between the claimant and the insurer using an evaluation that varies from the methods described in subsections (1) through (3) of this section, the agreement must be documented in the claim file. The insurer must take reasonable steps to ensure that the agreed value is accurate and representative of the actual cash value of a comparable motor vehicle in the principally garaged area.

WAC 284-30-391. The key question is what the nature of the agreement as to the "value or methodology" must be to satisfy this exception to following the settlement methodologies listed in Section 391(1)-(3). The third sentence explains that the "agreed value or methodology" must be "reached between the claimant and the insurer using an evaluation that varies from the methods described in subsections (1) through (3)." Reading this in the context of the regulations and for plain meaning, the Court construes this to require that the agreement expressly acknowledge that the value arrived at or methodology used otherwise does not comply with the settlement methodologies of Section 391(1)-(3). In the context of this case, the relevant question is whether the insured expressly agreed to the typical negotiation discount applied to the comparable cars used to determine the ACV in the Autosource Report. This agreement must also be documented in the claim file. WAC 284-30-391. To satisfy this safe harbor, State Farm bears the burden of showing that the claim file contains an express agreement by the insured to the Autosource Report's use of a typical negotiation discount. And because this safe harbor acts as an affirmative defense, State Farm bears the burden of showing that there is evidence of consent in the class and that this issue could impact commonality. See True Health Chiropractic, Inc. v. McKesson Corp., 896 F.3d 923, 932 (9th Cir. 2018) (noting that the defendant bears the burden of providing evidence of predominance-defeating consent to a TCPA claim).

State Farm has failed to convince the Court that the "agreed value" safe harbor threatens commonality. State Farm's primary witness states in his declaration that any agreed value must be documented in the claim file (Graff Decl. ¶¶ 23-24), but he testified that the claim file would only document an agreement to accept payment, not an agreement to use a non-compliant valuation methodology (Graff Dep. 81, 84-85). This cuts against State Farm's ability to satisfy the safe harbor, which requires the claim file to show an express agreement as to the use the typical negotiation discount. State Farm also fails to provide any evidence of any class member who has agreed to the typical negotiation discount. This is fatal to State Farm's argument, which requires some evidence of consent to defeat class certification. See True Health, 896 F.3d at 932. The only evidence State Farm points to is the "File History Notes" from the plaintiff in the related Jama matter, which say:

> "RCF [Received Call From] Anna from the Law offices of Daniel Whitmore the NI's [Named Insured's] attorney's office stating the NI [Named Insured] wants to settle out the claim … Value Accepted (Y/N):Y."

(Graff Decl. ¶ 23.) But these call notes just show that Jama wanted to be paid on the claim, not that he agreed to the use of the negotiation discount. And even if State Farm had produced some evidence sufficient to satisfy the safe harbor, it would not appear to require an in-depth analysis because State Farm is required to document the express agreement in each claim file. There would be no need for an extensive inquiry as to each claim.

State Farm also relies on Lynch's survey to argue that there is proof that State Farm reached an agreed value with most members of the proposed class. This argument is flawed because the survey did not ask whether the insured: (a) had a typical negotiation discount applied to the valuation, (b) knew that a typical negotiation discount had been applied, or (c) agreed to the use of the typical negotiation discount to reach the ACV of their total loss car. Instead, the survey just asked whether the insured was satisfied with the final settlement or whether the

insured "disagreed" with the "dollar value" of the settlement. (Dkt. No. 85-2 at 9-10.) The survey does not demonstrate proof of consent that might threaten commonality. See True Health, 896 F.3d at 932.

### b. ACV Determination

State Farm also argues that commonality cannot be shown because the ACV for each class member's vehicle will need to be individually determined. The Court is unconvinced.

First, State Farm ignores the fact that Plaintiffs do not quibble with the ACV determination in the Autosource Reports except as to the amount deducted for the negotiation discount and related sales tax. In other words, the Autosource-determined ACV is not at issue except for the amount of the typical negotiation discount that was taken. To combat this shortcoming, State Farm relies on Lundquist v. First Nat'l Ins. Co. of Am., No. C18-5301RJB, 2020 WL 6158984, at *2 (W.D. Wash. Oct. 21, 2020). But Lundquist is factually distinguishable. The claims there required a determination of whether the correct comparable vehicles and condition adjustments were used, which required plaintiffs to "prove that the dollar amount of a 'comparable vehicle' was inappropriate." Id. Here, Plaintiffs challenge only the legality of the deduction of the typical negotiation discount, not whether the comparable cars or condition adjustments were "inappropriate." The Court agrees with Plaintiffs that the analysis of the legality of the deduction does not require a claim-by-claim review. The Court rejects State Farm's argument, which assumes too much from what Plaintiffs have set out to prove.

### c. Weighting

State Farm argues that even if Section 391 does not allow the negotiation deduction, Section 392 does because it allows insurers to use weighting to adjust value of comparable vehicles including for negotiation discounts. This argument lacks merit. The first problem is that

State Farm asks the Court to label the negotiation discount a form of "weighting" despite the fact that it is used as a deduction to the ACV of comparable cars. As State Farm's own expert, Laurentius Marais, opines, "the 'adjustments' referred to in WAC Sec. 284-30-391 intrinsically involve addition and subtraction . . ., while the "weighting" referred to in WAC Sec. 284-30-392 intrinsically involves multiplication." (Expert Report of M. Laurentius Marais ¶ 13 (Dkt. No. 85-1).) Here, the typical negotiation discount is simply a deduction applied to the advertised price of each comparable car and does not involve weighting of the comparable cars. While the precise amount of the negotiation discount deducted from each comparable car may be reached through multiplication, the discount itself functions purely as a deduction or subtraction just as the other adjustments do in Section 391. The Court is not convinced that the typical negotiation discount is a form of weighting of the "identified vehicles to arrive at an average" value of the comparable vehicles. The second problem is that State Farm essentially asks the Court to read Section 392's mention of "weighting" as a means by which to expand the limited settlement methodologies for additions and deductions listed in Section 391(1)-(3). But by its own title, Section 392 is limited to "Information that must be included in the insurer's total loss vehicle valuation report." Section 392 does not expand the kinds of deductions and additions that can be taken under Section 391(1)-(3). The Court rejects this argument in full.

**D.      Rule 23(a)(3): Typicality**

To demonstrate typicality, Plaintiffs must show that the named parties' claims are typical of the class. Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). "Typicality

refes to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Id. (internal citation and quotation marks omitted). "The requirement is permissive, such that "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014)). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon, 976 F.2d at 508.

In light of the Court's revised class definition, the Court finds that Ngethpharat's claimed injury is atypical of the class because she cannot trace any injury to the negotiation discount. But the Court does find that Kelley's claimed injury is typical of the class, as he identifies that he was paid a value based on an Autosource Report that applied the negotiation discount. The Court is satisfied that Plaintiffs have shown Kelley's typicality.

**E.    Rule 23(a)(4): Adequacy of Representation**

"The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998) (quoting Fed. R. Civ. P. 23(a)(4)), overruled on other grounds by Wal-Mart, 564 U.S. 338. Adequacy of representation requires that "[f]irst, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Given Ngethpharat's atypicality, she cannot be an adequate representative of a class with whom she does not share a common injury. But Plaintiffs have otherwise demonstrated that

Kelley is an adequate class representative, committed to representing the class's interests and able to prosecute the action through counsel.

As to class counsel, the Court must also assess the following requirements of Rule 23(g):

(i) the work counsel has done in identifying or investigating potential claims in the action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). The Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). And class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

The Court is satisfied that attorneys Scott Nealey and Stephen Hansen are adequate class counsel who will fairly and adequately represent the interest of the class. Both Nealey and Hansen explain the work they have done to identify or investigate potential claims and their experience in handling class actions and other complex cases involving similar kinds of claims. (See Ex. 15 to Hansen Decl. (Dkt. No. 75-15)); Joint Declaration of Stephen Hansen and Scott Nealy (Dkt. No. 130-1)); Fed. R. Civ. P. 23(g)(1)(A)(i) and (ii). Nealy and Hansen have demonstrated throughout the course of this case their knowledge of the applicable law and the subject matter of this case. See Fed. R. Civ. P. 23(g)(1)(A)(iii). And they both aver that their two firms have the resources available to commit to representing the class, and have already made expenditures in this regard. See Fed. R. Civ. P. 23(g)(1)(A)(iv); (Joint Decl. ¶¶ 4-5 (Dkt. No. 130-1)). The Court therefore finds both Nealy and Hansen and their respective law firms to be adequate class counsel.

**F.     Rule 23(b)(3): Predominance**

Plaintiffs asks the Court to certify the class under the predominance and superiority requirements of Rule 23(b)(3). The Court assesses both issues, along with the question of damages.

**1.     Common questions of law and fact**

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453 (2016). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Id. (citation and quotation omitted). "The Rule 23(b)(3) predominance inquiry asks the court to make a global determination of whether common questions prevail over individualized ones." Torres v. Mercer Canyons Inc., 835 F.3d 1125, 1134 (9th Cir. 2016).

Plaintiffs have demonstrated the predominance of classwide issues over individual ones. The primary common question is whether the typical negotiation deduction included in the Autosource Report is legally permissible. As the Court has already explained in its discussion of commonality, resolution of this question can be made on a classwide basis using common evidence because it involves a legal determination whose impact will be felt equally by members of the class, all of whom received total loss valuations that included a negotiation deduction.

Plaintiffs have demonstrated that each class member's claim can be resolved using classwide proof, which suffices to show predominance.

State Farm makes five arguments against predominance, none of which has merit. The Court has already considered the first three arguments—whether individual issues persist because of the "agreed value" safe harbor, whether the Court must determine the ACV of class member's vehicle, and the permissibility of the negotiation discount as a form of weighting. These same arguments fail in the context of predominance, as none of them requires individual determinations to predominate over those common to the class. The Court also rejects State Farm's argument that the question of whether individual class members suffered an injury will predominate. (Opp. at 16-17.) As refined, the class definition includes only those who received payment based on an Autosource Report with the negotiation discount. If Plaintiffs succeed in proving liability, then each class member will have suffered the same injury compensable by refunding the improperly-applied negotiation discount. The Court finds no concerns as to the class members' individual injury and standing. See TransUnion LLC v. Ramirez, ___ U.S. ___, No. 20-297, 2021 WL 2599472, at * 10 (U.S. June 25, 2021) (noting that "[e]very class member must have Article III standing in order to recover individual damages"). Nor has State Farm identified any evidence, let alone the claimed "significant evidence," that the class "includes a large percentage of uninjured class members who . . . reached an 'agreed value.'" (Opp. at 17.) This theoretical argument does not defeat predominance.

Lastly, the Court rejects State Farm's argument that the issue of causation under the CPA is an individual issue that will predominate, making class certification improper. State Farm argues "the only way to determine proximate causation is through an assessment of each class member's claim that State Farm's purported failure to explain the typical negotiation adjustment

caused his or her damages." (Opp. at 18 (Dkt. No. 83).) State Farm is correct that causation is an element of Plaintiffs' CPA claim. See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 793 (1986) ("A causal link is required between the unfair or deceptive acts and the injury suffered by plaintiff.") But here, Plaintiffs challenge the application of the typical negotiation discount as a per se CPA violation. This stands in contrast to Kelley v. Microsoft Corp., 2011 WL 13353905 (W.D. Wash. May 24, 2011), on which State Farm relies, where the question of causation depended on the "motivation of each consumer." Id. at *3. Here, the insured's motivation is irrelevant given the per se nature of the claimed violation. What matters is whether the negotiation discount is permitted.

### 2. Damages and the Damages Model

State Farm argues that Plaintiffs have not shown that there is common proof of damages or a viable damages model consistent with their theory of liability. The Court disagrees.

Under Rule 23(b), the Plaintiffs must show that "damages are capable of measurement on a classwide basis" and that the proposed damages model is consistent with the theory of liability. See Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013). Plaintiffs pursue both breach of contract and CPA claims, and the Court reviews the recoverable damages under both claims. As to their breach of contract claim, Plaintiffs are entitled to the benefit of the bargain: "Contract damages are ordinarily based on the injured party's expectation interest and are intended to give that party the benefit of the bargain by awarding him or her a sum of money that will, to the extent possible, put the injured party in as good a position as that party would have been in had the contract been performed." Ford v. Trendwest Resorts, Inc., 146 Wn.2d 146, 155 (2002) (citation and quotation omitted). This includes the benefit of having the insurer comply with insurance regulations, because when applicable regulations provide a specific procedure for settling claims

they become "a part of and should be read into the insurance policy." See Touchette v. NW Mut. Ins. Co., 80 Wn.2d 327, 332 (1972). As to the CPA, a plaintiff may bring a private CPA action against their insurers for breach of the duty of good faith or for violations of Washington insurance regulations. Peoples v. United Servs. Auto. Ass'n, 194 Wn.2d 771, 778 (2019). The failure by an insurer to follow WAC requirements in settling an insurance claim is a per se CPA violation—meaning that the practice is unfair and deceptive and occurs in the conduct of trade or commerce. Van Noy v. State Farm Mut. Auto. Ins. Co., 98 Wn. App. 487, 495-96 (1999) aff'd, 142 Wn.2d 784 (2001). And "the deprivation of contracted-for insurance benefits is an injury to 'business or property' regardless of the type of benefits secured by the policy." Peoples, 194 Wn.2d at 779 (finding that wrongful denial of PIP benefits are compensable under the CPA). Under the CPA, damages are properly calculated by determining the amount of the wrongly withheld contracted-for insurance benefits. See id.

Plaintiffs propose a manageable and reasonable damages model that matches their theory of liability as to the refined class of individuals who were paid an amount based on a negotiation discount. If Plaintiffs are correct that the negotiation discount is impermissible, then the proper measure of damages is the refund of the negotiation discount and related sales tax. This is the benefit of the bargain to which the insureds were entitled given the method by which State Farm chose to settle the claims. Plaintiffs have identified common evidence in State Farm's and Audatex's possession that can be used to determine the negotiation discount for each class member. (See Torelli Report ¶¶ 4, 15-23 (Dkt. No. 75-1).) The process of doing that calculation appears one capable of common treatment and resolution using a common methodology.

State Farm makes several unsuccessful arguments as to why damages do not meet the commonality and predominance requirements. First, State Farm argues that an "in-depth

analysis" of exactly what each class member was "actually underpaid" is required. (Dkt. No. 83 at 19.) This, State Farm argues, would require an analysis of each class member's vehicle to determine what the difference between the ACV and what State Farm paid. This argument fails to grapple with the reality that Plaintiffs do not quibble over the ACV as determined by the Autosource Report—just the negotiation discount and the related sales tax.

Second, State Farm argues that representative evidence cannot be used to determine classwide damages. (Def. Opp. at 21-23.) The Court need not reach this issue because Plaintiffs have shown how damages can be properly calculated on an individual claim basis rather than on an aggregate basis. (See Torelli Report at ¶¶ 4, 15-23.) But given the Parties' discussion of this potential methodology, the Court briefly reviews this issue. As Torelli opines, a sample of claims can be used to determine classwide damages. (See id. ¶ 24.) He adds further detail to this proposed methodology with the Reply brief, explaining how he can "generate a relatively accurate individual damages figure for each class member to be used in a distribution phase" using Audatex's price bands and data from State Farm. (Torelli Supplemental Report ¶ 21 (Dkt. No. 88).) State Farm levies two unsuccessful attacks to this approach. First, State Farm argues that aggregate damages would be inappropriate if the methodology allows class members who did not actually receive a negotiation discount to recover. But by limiting the class to those who received a settlement with the negotiation discount applied, the Court finds no potential problem of providing recovery to those who suffer no damages. Second, State Farm invokes the recent Olean decision to argue that use of statistical sampling and aggregate damages will violate the Rules Enabling Act by expanding its liability to individuals who have not been harmed. But Olean was concerned with the use of representative sampling to prove liability, not damages. The Court made that distinction quite clear:

Moreover, even if class members suffered individualized damages that diverged from the average overcharge calculated by Plaintiffs' expert, "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva, 716 F.3d at 514. Indeed, we have consistently distinguished the existence of injury from the calculation of damages. See Vaquero, 824 F.3d at 1155; Senne, 934 F.3d at 943. Consequently, individualized damages calculations do not, alone, defeat predominance— although, as we discuss below, the presence of class members who suffered no injury at all may defeat predominance.

Olean, 993 F.3d at 790. Here, sampling is proposed only to calculate damages, not to prove liability. And State Farm will still be permitted to challenge individual claims with any available affirmative defense, such as the "agreed value" safe harbor State Farm has identified. The Court does not find any issue with the potential use of sampling in this case.

### 3. Class Treatment is Superior and Manageable

"In determining superiority, courts must consider the four factors of Rule 23(b)(3)." Zinser v. Accufix Rsch. Inst., Inc., 253 F.3d 1180, 1190 (9th Cir.), as amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001). The four factors are:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

Plaintiffs have shown sufficient superiority here. First, this case involves relatively small deductions to total loss settlements on damaged cars where the likelihood of recovery is likely outweighed by the costs of individual litigation. As the Ninth Circuit has explained, "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." Zinser, 253 F.3d at 1190; see Fed. R. Civ. P. 23(b)(3)(A). Second,

neither party has identified any other cases (other than <u>Jama</u>) involving these kinds of claims

against State Farm. <u>See</u> Fed. R. Civ. P. 23(b)(3)(B). Third, there is good reason to focus the

claims in this forum because it applies Washington law to Washington residents who have the

same policies from State Farm and who encountered this same common practice of applying the

negotiation discount. <u>See</u> Fed. R. Civ. P. 23(b)(3)(C). Fourth, notwithstanding State Farm's

arguments discussed below, there are no obvious difficulties in managing this on a class basis.

See Fed. R. Civ. P. 23(b)(3)(D).

State Farm argues that this case is not manageable because it will require determining

whether anyone in the class submitted evidence supporting a different valuation and was paid on

that amount. State Farm argues this will require great labor to determine who is in the class and

is not "administratively feasible." (Dkt. No. 83 at 29.) But Plaintiffs have provided sufficient

evidence that this determination is relatively straightforward and is administratively manageable

based on the claim files and data available for review. State Farm also argues that appraisal is a

far superior process to determining ACV. But this is a red herring. Plaintiffs do not dispute the

ACV determined by State Farm other than as to the negotiation discount. Thus, the appraisal

process would not necessarily resolve the dispute. And State Farm has not shown that the use of

an appraisal for each class member would be superior, particularly where the costs would likely

eclipse the modest amount at issue for each insured's claim.

## G.      Surreply

State Farm asks the Court to strike: (1) portions of Plaintiffs' Reply (Dkt. No. 97), (2)

Torelli's Supplemental Expert Report and Declaration filed with the Reply, including

attachments 1 through 4 (Dkt. No. 88); and (3) the Supplemental Declaration of Darrell M.

Harber, including attachments A through E (Dkt. No. 92). The Court GRANTS in part and DENIES in part the request.

First, State Farm asks the Court to strike the portions of Plaintiffs' Reply and Torelli's supplemental report that contain new arguments and evidence about a 150-claim file sample that were raised for the first time in reply. The Court agrees that these arguments and evidence were improperly raised for the first time in reply. See Docusign, Inc. v. Sertifi, Inc., 468 F. Supp. 2d 1305, 1307 (W.D. Wash. 2006). It is true the Court ordered the production of the 150-claim file sample after Plaintiffs moved for class certification. (Order on Motion to Compel (Dkt. No. 76).) But Plaintiffs did not ask for an extension of the class certification deadline or for leave to amend their Motion once they received the Order or the sample. Instead, Plaintiffs claimed in their Motion that "the evidence that has already been gathered" showing class certification is proper. (Dkt. No. 74 at 3.) The Court thus STRIKES the argument based on the sample, and Torelli's materials submitted with the reply. (Dkt. No. 88, 97.) The Court does not, however, find it proper to strike Torelli's further statements about calculating classwide damages using a potential, future sample of class claims. These statements merely expand on his initial report to respond to State Farm's opposition briefing and is not improper.

Second, State Farm asks the Court to strike Darrell Harber's supplemental declaration and exhibits and Plaintiffs' reliance on it in the Reply. The Court has not considered these arguments and evidence and DENIES the request as MOOT.

Third, State Farm also asks the Court to strike Harber's and Torelli's declarations/reports as improper supplemental reports filed after the expert deadline. Given the Court's ruling above, the Court DENIES this request as MOOT. And the Court does not find Torelli's further

statements about the sampling methodology for calculating classwide damages to an improper supplementation that must be stricken and DENIES the motion as to this request.

## CONCLUSION

Plaintiffs have provided sufficient evidence to establish by a preponderance that class certification is appropriate and proper under Rule 23(a) and Rule 23(b)(3). The Court certifies the following class:

> All STATE FARM [Mutual] insureds with Washington first party personal line policies issued in Washington State, who received compensation for the total loss of their own vehicles under their First Party (Comprehensive, Collision, and UMPD) coverages, and whose claim was settled and paid using the amount determined by a total loss valuation from Audatex based upon the value of comparable vehicles which took a deduction/adjustment for "typical negotiation."

> Excluded from the Class would be (a) the assigned Judge, the Judge's staff and family, and State Farm employees; (b) claims for accidents with dates of loss occurring before March 25, 2014; (c) claims where the total loss was on a "non-owned" (borrowed or rented) vehicles; and (d) claims where the insured submitted written evidence supporting a different valuation, and the amount of that different valuation submitted by the insured was paid by State Farm to settle the total loss.

The Court also appoints James Kelley as class representative and Stephen Hansen of the Law Offices of Stephen M. Hansen, P.S. and Scott P. Nealy of the Law Office of Scott P. Nealy as class counsel. But Plaintiff Anysa Ngethpharat may only pursue her claims individually and not on behalf of anyone similarly situated—which is now reflected in the caption.

The Court also GRANTS in part and DENIES in part State Farm's surreply/motion to strike. The Court STRIKES in part the supplemental report of Torelli and the Reply's citation to it concerning the 150-claim sample. The Court does not strike the additional information Torelli provides about calculating classwide damages using a future sample. The Court DENIES as MOOT State Farm's request to strike the supplemental Harber declaration and the Reply's citation to it. And the Court DENIES as MOOT the request to strike Harber's declaration and

Torelli's supplemental reports as to the 150-claim sample, and DENIES the request to strike

Torelli's supplemental report as to classwide damages based on a sampling methodology.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 1, 2021.

Marsha J. Pechman
United States Senior District Judge