1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
9                       AT SEATTLE

10   ANYSA NGETHPHARAT and JAMES        CASE NO. C20-454 MJP
     KELLEY,
11                                       ORDER ON CROSS-MOTIONS
                    Plaintiffs,          FOR SUMMARY JUDGMENT AND
12                                       MOTION TO EXCLUDE
            v.
13
     STATE FARM MUTUAL
14   AUTOMOBILE INSURANCE
     COMPANY,
15
                    Defendant.
16   FAYSAL JAMA,

17          Plaintiff,

18          v.

19   STATE FARM FIRE AND
     CASUALTY COMPANY,
20
            Defendant.
21

22

23

24

1    This matter comes before the Court on Plaintiffs' Motion for Summary Judgment (Dkt.

2    No. 188), Defendants' Motion for Summary Judgment (Dkt. No. 185), and Defendants' Motion

3    to Exclude the Declaration of Mary Owen (Dkt. No. 204). Having reviewed the Motions, the

4    Responses (Dkt. Nos. 191, 195, 209), the Replies (Dkt. Nos. 196, 198, 212), Defendants'

5    Surreply (Dkt. No. 201), the Supplemental Briefing (Dkt. Nos. 258, 259, 260, 261), and all

6    supporting materials, and having held oral argument on July 8, 2025, the Court GRANTS in part

7    and DENIES in part Plaintiffs' Motion for Summary Judgment, GRANTS Defendants' Motion

8    for Summary Judgment, and DENIES AS MOOT Defendants' Motion to Exclude.

9    **BACKGROUND**

10    Plaintiffs challenge Defendants State Farm Mutual Automobile Insurance Company's

11    and State Farm Fire and Casualty Company's (together, State Farm) methodology for

12    determining the actual cash value (ACV) of an insured's total loss vehicle in Washington.

13    Plaintiffs Anysa Ngethpharat, James Kelley, and Faysal Jama attack State Farm's practice of

14    applying a "typical negotiation" deduction to the comparable cars used to determine the ACV of

15    an insured's total loss vehicle. Jama also attacks State Farm's practice of applying a condition

16    deduction to the comparable cars used to determine the ACV of an insured's total loss vehicle.

17    These deductions appear in reports prepared by a third-party, Audatex, who generates what are

18    referred to as "Autosource Reports." Through these consolidated actions, Plaintiffs variously

19    pursue the following claims: breach of contract, violations of the Washington Consumer

20    Protection Act (CPA), breach of the implied covenant of good faith and fair dealing, and bad

21    faith.

22    This case has a long procedural history that is relevant to the pending motions. The Court

23    initially certified two classes and appointed Kelley and Jama as the class representatives of their

24

respective classes. But the Court's then issued an order decertifying the classes and granting

summary judgment in State Farm's favor in light of the Ninth Circuit's decision in Lara v. First

National Insurance Company of Am., 25 F.4th 1134 (9th Cir. 2022) and the apparent lack of

evidence of injury. (Order Granting Summary Judgment and Decertification (Dkt. No. 219)

(Decertification Order).) Plaintiffs then appealed, and the Ninth Circuit reversed the Court's

decision, finding that there was, in fact, sufficient evidence of injury to permit the case to

proceed.

Post remand, the Parties now ask the Court to rule on those portions of their previously-

briefed Motions for Summary Judgment that the Court did not reach in its Decertification Order.

Specifically, Plaintiffs ask the Court to award damages in their favor on their claims, including

class-wide damages, enhanced damages under the Consumer Protection Act, and prejudgment

interest. State Farm asks the Court to rule on its Motion for Summary Judgment that seeks to

limit the recoverable class periods, and its Motion to Exclude a declaration filed by Mary Owen

filed in support of Plaintiffs' request for enhanced damages under the CPA. To orient the reader,

the Court reviews the factual allegations specific to the three named Plaintiffs, the relevant

regulatory framework, prior decisions of this Court and the Ninth Circuit, and an outline of the

pending motions.

**A.      Factual Allegations**

The Court reviews the facts related to the settlement of Ngethpharat's, Kelley's, and

Jama's total loss claims.

After declaring Ngethpharat's car a total loss, State Farm offered her $13,378 as her car's

actual cash value, based on an Autosource Report using multiple comparable vehicles adjusted

for a "typical negotiation." (Declaration of Peter Herzog, Exs. 11 & 12 (Dkt. No. 85).) Through

counsel, Ngethpharat objected to the valuation and the negotiation discount, and provided her own valuation proposal based on comparable vehicles she had identified. (Herzog Decl., Ex. 13.) State Farm then "escalated" her claim and obtained a second Autosource Report based on two dealer quotes which included no adjustment for a "typical negotiation." (Herzog Decl., Ex. 14.) That second valuation was somewhat higher, at $13,948. (Id. at 2.) When Ngethpharat continued to object to the valuation, State Farm paid Ngethpharat $13,948, representing the amount it did not dispute it owed her, which was the amount listed on the second Autosource Report. (Expert Report of Paul Torelli ¶ 16 (Dkt. No. 75-1).)

Kelley had a somewhat different experience when State Farm settled his total loss claim. After determining Kelley's vehicle to be a total loss, State Farm offered him $54,056 based on an Autosource Report that used a single comparable vehicle with a typical negotiation discount applied. (Herzog Decl. Ex. 15.) The Autosource Report "adjusted" the comparable vehicle's advertised price from $58,580 to $55,651 (a $2,929 deduction) to "account for typical negotiation." (Ex. 4 to Declaration of Peter Herzog ISO State Farm Opp. to Pls. MSJ (Dkt. No. 193-4 at 7).) Kelley was then paid $55,651.

Jama was an insured of State Farm when it deemed his 2009 Honda Civic Hybrid sedan a total loss in May 2019. (See Declaration of Faysal Jama, ¶ 2 and Ex. A (C20-652 MJP, Dkt. No. 39).) State Farm obtained an Autosource Report to determine the actual cash value of Jama's vehicle by using four different comparable vehicles. (Id. Ex. B.) The Autosource Report made adjustments to account for differences with the Jama's vehicle, including mileage and options. (Id. at Ex. B.) The Autosource Report reduced the value of each comparable vehicle by 9% as a "typical negotiation discount," and it took an addition $155 deduction for the apparent atypical condition of Jama's car. (Id.) However, neither Audatex nor State Farm inspected the condition

1    of the comparable vehicles, though State Farm did inspect the condition of Jama's vehicle.

2    (Deposition of Neal Lowell at 145-46, 148-50 (Dkt. No. 45).) Through a representative of

3    Plaintiff's counsel's firm, Plaintiff requested to "settle out the claim." (Graff Decl. ¶ 23 & Ex. B

4    (Dkt. No. 54 and 54-2 at 4).) State Farm paid the amount set out in the Autosource Report, but

5    Plaintiff maintains that he continued to dispute the valuation. (See Resp. to RFA Nos. 2-3, 5, 7

6    (Dkt. No. 55-19).)

7    **B.    Regulatory Framework**

8          In denying State Farm's Motion to Dismiss the claims in both consolidated cases, the

9    Court explained the regulatory framework applicable to State Farm's determination of each total

10   loss vehicle's ACV. (Order on Motion to Dismiss (Dkt. No. 49).) The Order explained the

11   regulatory framework as follows:

12       **C.    Relevant Regulatory Framework**

13       Plaintiffs' claims turn on the allegations that State Farm violated Washington insurance
         regulations applicable to total loss settlements: WAC 284-30-391 ("Section 391").

14       Section 391 establishes the methods by which an insurer "must adjust and settle vehicle
         total losses" and the standards of practice for the settlement of total loss vehicle claims.

15       These two standards work in tandem and impose intertwined, but independent
         requirements on the insurer.

16
         **1.    Settlement and adjustment process requirements**
17

18       Section 391 states: "unless an agreed value is reached, the insurer must adjust and settle
         vehicle total losses using the methods set forth in subsections (1) through (3) of this

19       section." WAC 284-30-391 (emphasis added). But the insurer need follow just one of
         these three methods.

20       At issue in this case is Section 391's "cash settlement" methodology. This provision
         permits the insurer to "settle a total loss claim by offering a cash settlement based on

21       the actual cash value of a comparable motor vehicle, less any applicable deductible provided
         for in the policy." WAC 284-30-391(2). Section 391(2) includes two key provisions to

22       determine actual cash value of a comparable motor vehicle. First, to determine the actual
         cash value, "only a vehicle identified as a comparable motor vehicle may be used." WAC

23       284-30-391(2)(a). Second, the insurer must "determine the actual cash value of the loss
         vehicle by using any one or more of the following methods": (1) comparable motor

24

vehicle; (2) licensed dealer quotes; (3) advertised data comparison; or (4) computerized sources. WAC 284-30-391(2)(b)(i)-(iv).

The insurance regulations include two general definitions relevant to this dispute. First, the regulations define the term "actual cash value" to mean "the fair market value of the loss vehicle immediately prior to the loss." WAC 284-30-320(1). And the regulations define "comparable motor vehicle" as "a vehicle that is the same make and model, of the same or newer model year, similar body style, with similar options and mileage as the loss vehicle and in similar overall condition, as established by current data." WAC 284-30-320(3). This definition also states that "[t]o achieve comparability, deductions or additions for options, mileage or condition may be made if they are itemized and appropriate in dollar amount." Id.

### 2.    Total loss claim settlement practice requirements

Section 391 also "establish[es] standards of practice for the settlement of total loss vehicle claims" which the "insurer must" follow. WAC 284-30-391(4). Relevant here is Section 391(4)(b), which says that the insurer must "[b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently available, or were available within ninety days of the date of loss, using appropriate deductions or additions for options, mileage or condition when determining comparability."

(Order on Motion to Dismiss at 5-6.)

In ruling on the Motion to Dismiss, the Court made several conclusions that guide its resolution of the Motions for Summary Judgment. First, the Court found that "[t]o give full effect to the language of Section 391(2), the Court finds that the 'actual cash value' determination must comply with the methodologies set forth in Section 391(2)." (Order on MTD at 10 ("This determines the 'fair market value' of a comparable vehicle, which is consistent with the general definition of "actual cash value" in Section 320.").) Second, the Court concluded that Section 391(4)(b) provides an exclusive list of the kinds of deductions that an insurer may take in compliance with Section 391(2), and these do not include a typical negotiation deduction. (Id. at 11-12.) Third, the Court explained that to comply with Section 391(4), any deduction must also be itemized and verifiable. (Id. at 13-14.) The Court defined the terms "itemized" and "verifiable" as follows: "Merriman Webster defines the term 'itemized' as 'to set down in detail

1   or by particulars; list' and defines 'verifiable' as to be able to 'establish the truth, accuracy or

2   reality of.'" (<u>Id.</u> at 13 (citation and quotation omitted).)

3   **C.    Procedural History**

4        In these subsections, the Court reviews relevant prior rulings and the Ninth Circuit's

5   Opinion.

6        **1.    Law Class Certification**

7        Before the Court consolidated the two underlying cases, it certified classes in both

8   actions. In the <u>Kelley/Ngethpharat</u> action, the Court certified a class of individuals who received

9   payment for a total loss vehicle whose actual cash value was determined using an Autosource

10  report that included a typical negotiation deduction. (Order on Class Cert. (Dkt. No. 136).) In the

11  <u>Jama</u> action, the Court certified two classes: (1) a class of individuals who received payment for

12  a total loss vehicle whose actual cash value was determined using an Autosource report that

13  included a typical negotiation deduction; and (2) a class of individuals who received payment for

14  a total loss vehicle whose actual cash value was determined using an Autosource report that

15  included a condition adjustment. (Order on Class Cert. (C20-652 MJP Dkt. No. 109).) Kelley

16  was appointed to lead the class in his action, while Jama was appointed to lead both classes in his

17  action. The Court determined that Ngethpharat was not a proper class representative because the

18  ACV on which she received payment was based on two dealer quotes that did not include a

19  negotiation discount. Not long after the classes were certified, the Court consolidated the cases.

20  (Dkt. No. 155; C20-652 MJP Dkt. No. 133.)

21       **2.    Rulings Concerning Damages**

22       While the Parties presently dispute damages, the Court has had prior occasion in the life

23  of this case to evaluate damages and injury in the context of its Order Granting Class

24

1    Certification. In that Order, the Court rejected State Farm's argument that Plaintiffs had to prove

2    they received less than the ACV for their car or that this was an individualized consideration

3    defeating certification. (Order on Class Certification at 15 (Dkt. No. 136) (N.B., the Order in

4    Jama is substantively the same on this issue, and the Court therefore relies on the analysis in the

5    Ngethpharat matter).) The Court explained that "Plaintiffs do not quibble with the ACV

6    determination in the Autosource Reports except as to the amount deducted for the negotiation

7    discount and related sales tax." (Id.)  The Court accepted Plaintiffs' theory that the correct ACV

8    was set out in the Autosource reports if one backed out the "typical negotiation discount" or the

9    negative condition adjustment. (Id.) And the Court distinguished the decision in Lara by pointing

10   out that the claims those plaintiffs pursued "required a determination of whether the correct

11   comparable vehicles and condition adjustments were used, which required plaintiffs to "prove

12   that the dollar amount of a 'comparable vehicle' was inappropriate." (Id. (citing Lundquist v.

13   First Nat'l Ins. Co. of Am., No. C18-5301RJB, 2020 WL 6158984, at *2 (W.D. Wash. Oct. 21,

14   2020) (note that Lundquist became Lara v. First Nat'l on appeal)).) The Court concluded that the

15   question of damages was common because the Plaintiffs in this action "challenge only the

16   legality of the deduction of the typical negotiation discount, not whether the comparable cars or

17   condition adjustments were 'inappropriate.'" (Id.) In other words, the Court accepted the

18   Plaintiffs' argument that the Autosource Reports showed a correct ACV if one backed out the

19   "illegal" deductions. And given that conclusion, damages were simply the amount of the

20   impermissible deductions, which could be shown on a classwide basis without individualized

21   ACV determinations.

22

23

24

### 3. Decertification, Summary Judgment, and the Ninth Circuit's Reversal

In 2022, the Ninth Circuit issued a decision in the appeal from a Lundquist/Lara that caused the Court to reconsider both certification and the viability of the claims. In Lara v. First Nat'l, the Ninth Circuit held that the district court improperly certified a class of individuals who claimed they were underpaid for their total loss vehicles because the valuation included a deduction for the car's condition. Id., 25 F.4th 1134. The Ninth Circuit determined that the class's injury would need to be proved individually given the nature of how the class was defined and how the deduction was alleged to violate state law.

Based on Lara, State Farm's moved to decertify the negotiation and condition classes, and for summary judgment. The Court then granted decertification and summary judgment in State Farm's favor given the lack of evidence that any of the Plaintiffs received less than fair value for their total loss vehicles. (Decertification Order.) The Court did not rule on several other arguments in State Farm's Motion for Summary Judgment, State Farm's Motion to Exclude, or any part of Plaintiffs' then-pending Motion for Summary Judgment.

Plaintiffs then appealed to the Ninth Circuit, and obtained reversal. As to the negotiation deduction only, the Ninth Circuit disagreed with the Court's reading of Lara. It identified two points of distinction that meant the claims could proceed on a classwide basis. First, the Court explained that in its class certification order, the Court solved much of the problems that led to the determination that the class was overbroad in Lara. The class in Lara included anyone who had a "condition" deduction, without any limitation on whether they received a payment that was based on a such condition deduction. Well before the Ninth Circuit's decision, the Court in these consolidated cases solved that problem by limiting the classes to those who were paid a value that were based on either the negotiation or condition deduction. By doing so, the Court avoided

the problem in <u>Lara</u> that required decertification—inclusion of individuals who were not paid

based on an improper deduction. Second, the Ninth Circuit held that the Court erred in finding no

distinction between a "negotiation" and "condition" deduction. The Court explained that while a

condition deduction could be permissible if properly determined on a case-by-case basis, the

negotiation discount was either legal or illegal as a matter of law. The Court explained:

> Plaintiffs have advanced an entirely different theory with respect to the negotiation class. As to that class, their theory is not that State Farm failed to follow the correct procedure for making permissible adjustments, but rather that Washington law does not permit State Farm to apply a discount for typical negotiation at all. <u>See</u> Wash. Admin. Code § 284-30-391(4)(b). The district court accepted this argument, holding that Washington law permits insurers to apply only those deductions explicitly laid out in Section 391(4)(b) and no others. State Farm has not challenged that holding here.

(<u>Jama</u>, Slip Op. at 18.) The Court then explained that:

> All members of the negotiation class in this case, however, received less than they were owed in the exact amount of the impermissible negotiation deduction. As to the proposed negotiation class in this case, we therefore conclude that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount.

(<u>Id.</u> at 19.) The Court further explained: "Nothing in Lara precludes common proof of injury as

the amount of State Farm's estimates less the impermissible deduction as to the class of owners

who were paid the Autosource valuation." (<u>Id.</u> at 22-23.)

The Ninth Circuit also provided a discussion of the nature of the evidence as to damages.

It explained:

> Because we conclude that the district court misread <u>Lara</u> as to the negotiation discount, it follows that the district court's entry of summary judgment against the named Plaintiffs based on their claims for the negotiation discount was in error. We further hold that—even as to the challenged condition adjustment—the district court also erred in holding that Plaintiffs could not rely on the Autosource reports, and the amount of a challenged adjustment, as relevant evidence of value and injury.

(<u>Jama</u>, Slip Op. at 24.) And as it particularly relevant here, the Court explained that expert

valuation is unnecessary:

Nothing in <u>Lara</u> required (as the district court appeared to believe) "[p]laintiffs [to] undertake[] a[] separate valuation process or retain[] an expert to opine on the value of the loss vehicles." Indeed, State Farm itself used the Autosource reports as one proper measure of actual cash value. And ample evidence provided by State Farm itself demonstrated how the Autosource reports were prepared and why they provided an accurate measure of the pre-crash actual cash value of drivers' cars. We see no reason why a plaintiff seeking to prove injury cannot rely on the Autosource reports themselves to establish value, minus the unlawful negotiation adjustment. And here, as noted, the class is limited to those who were paid the Autosource valuation. Accordingly, the district court's conclusion that Lara requires individual plaintiffs to introduce evidence of value independent of the valuation reports was error. We therefore vacate its entry of summary judgment in favor of State Farm. On remand, the district court should evaluate anew whether the named Plaintiffs have adduced sufficient evidence of injury consistent with this opinion.

(<u>Id.</u> at 25-26.) Additionally, the Court notes a footnote which explains the relevance of valuation:

As to specific named plaintiffs, it may be clear from the records that the Autosource reports less a challenged adjustment do not provide sufficient evidence of injury to get past summary judgment. For instance, named plaintiff Ngethpharat's payout was not directly based on an Autosource report containing a challenged deduction since she challenged State Farm's initial valuation and subsequently obtained a second valuation excluding the challenged deduction, which is why the district court excluded her from the class it certified. We do not today decide whether Ngethpharat or any other named plaintiff in fact adduced sufficient evidence of injury to survive summary judgment. Rather, we merely hold that nothing about Lara precludes plaintiffs from relying on the difference between an insurer's calculation of value and the amount of a challenged adjustment as relevant evidence of injury. The district court should apply this standard to the claims before it in the first instance.

(<u>Id.</u> at 26 n.10.)

As the Ninth Circuit explained: "[a]s to the proposed negotiation class in this case, we therefore conclude that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount." (<u>Jama</u>, Slip Op. at 19.) There is therefore no independent need to propose a value for each car in this Class. (<u>See</u> <u>id.</u> at 21-22 (rejecting the argument that values independent of the Autosource reports are needed to show injury).) The Ninth Circuit's concluded as follows:

> the district court's conclusion that <u>Lara</u> requires individual plaintiffs to introduce evidence of value independent of the valuation reports was error. We therefore vacate its entry of summary judgment in favor of State Farm. On remand, the district court should evaluate anew whether the named Plaintiffs have adduced sufficient evidence of injury consistent with this opinion.

(<u>Id.</u> at 25-26.) The Ninth Circuit also agreed with the Court's decision that condition-deduction claims in <u>Jama</u> cannot proceed on a class basis. (<u>Id.</u> at 23-24.)

**D.    Pending Motions**

With the Ninth Circuit's determination in hand, the Court is now tasked with deciding the remaining issues from the Cross-Motions for Summary Judgment that were left unresolved. Following remand, the Parties submitted a Joint Status Report that outlined the portions of the Cross-Motions and State Farm's Motion to Exclude they would like decided. (Dkt. No. 240.) And the Parties then filed supplemental briefs on: (1) damages and (2) whether a jury must decide enhanced CPA damages. At oral argument, Plaintiffs alerted the Court that they are dismissing Jama's claims related to the condition adjustment. As such the Court does not consider those claims in this Order and they are hereby DISMISSED.

**ANALYSIS**

**A.    Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. <u>Id.</u> at 248. The moving party bears the initial burden of showing that there is no evidence which supports an

element essential to the nonmovant's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." <u>Celotex</u>, 477 U.S. at 323-24.

**B.    Plaintiffs' Motion for Summary Judgment**

Plaintiffs move for summary judgment, individually and on behalf of the Classes, seeking summary judgment on their CPA and breach of contract claims. Plaintiffs ask the Court to find liability and then award damages, treble damages, and prejudgment interest. The Court agrees only in part.

**1.    State Farm's Use of a Negotiation Discount Violates the CPA**

Plaintiffs have provided undisputed evidence that State Farm violated the CPA by determining the ACV based on an unpermitted negotiation discount that violates state insurance regulations.

**a.    Legal Standard**

"To prevail in a CPA action, a private plaintiff must prove (1) an unfair or deceptive act or practice (2) in trade or commerce (3) that affects the public interest (4) and causes injury to the plaintiff's business or property, and (5) a causal link between the act and the injury." <u>Peoples v. United Servs. Auto. Ass'n</u>, 194 Wn.2d 771, 778 (2019) (citing <u>Hangman Ridge Training Stables v. Safeco Title Ins. Co.</u>, 105 Wn.2d 778, 784-85 (1986)). "The first two elements may be established by showing that the alleged act constitutes a per se unfair trade practice." <u>Van Noy v. State Farm Mut. Auto. Ins. Co.</u>, 98 Wn. App. 487, 495-96 (1999), <u>aff'd</u>, 142 Wn.2d 784 (2001). "The legislature has expressly declared that the insurance business is one 'affected by the public interest' and has prohibited insurers from engaging in unfair or deceptive acts as defined by the

1    legislature or the insurance commissioner." Peoples, 194 Wn.2d at 778 (citing RCW 48.01.030;

2    RCW 48.30.010(1)-(2)). The insurance commissioner has defined unfair settlement practices

3    both generally and in the context of total loss settlements. WAC 284-30-330, -391. "The

4    legislature has made actions prohibited by the insurance laws subject to the CPA's enforcement

5    provisions." Peoples, 194 Wn.2d at 778 (citing RCW 19.86.170). "Based on this legislative

6    scheme, we have held that a violation of an insurance regulation is a per se unfair or deceptive

7    act or practice." Id. (citation omitted).

8         Under Section 391, an insurer may "settle a total loss claim by offering a cash settlement

9    based on the actual cash value of a comparable motor vehicle, less any applicable deductible

10   provided for in the policy." WAC 284-30-391(2). State Farm here made cash settlements to each

11   Plaintiff, which renders this provision operative. When making a cash settlement, the insurer

12   must do three things. First, in determining the actual cash value, "only a vehicle identified as a

13   comparable motor vehicle may be used." WAC 284-30-391(2)(a). Second, the insurer must

14   "determine the actual cash value of the loss vehicle by using any one or more of the following

15   methods": (1) comparable motor vehicle; (2) licensed dealer quotes; (3) advertised data

16   comparison; or (4) computerized sources. WAC 284-30-391(2)(b)(i)-(iv). Third, the insurer must

17   "[b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently

18   available, or were available within ninety days of the date of loss, using appropriate deductions

19   or additions for options, mileage or condition when determining comparability." Section 391(4)

20   "establish[es] standards of practice for the settlement of total loss vehicle claims" which the

21   "insurer must" follow. WAC 284-30-391(4)(b). Section 391(4) applies in addition to Section

22   391(2) because it  "establish[es] standards of practice for the settlement of total loss vehicle

23   claims" which the "insurer must" follow. WAC 284-30-391(4).

24

1

        **b.**    **<u>Per Se</u> Violation of CPA**

2

     Plaintiffs have established that State Farm committed a <u>per se</u> violation of the CPA that

3

affects the public interest by settling their total loss claims using an impermissible "typical

4

negotiation" deduction. As this Court has previously held, Section 391(4) does not permit

5

deductions for a "typical negotiation." (Order on MTD at 11-12.) That reasoning continues to be

6

persuasive and the Court finds no reason to deviate from its prior ruling. Here, the

7

uncontroverted evidence demonstrates that State Farm determined the ACV of Jama's and

8

Kelley's vehicles by applying a deduction for a "typical negotiation" that is not permitted by law.

9

In so doing, State Farm violated state insurance regulations and the CPA, satisfying the first two

10

<u>Hangman Ridge</u> elements. And the conduct of insurers affects the public interest—the third

11

element. RCW 48.01.030; <u>Peoples</u>, 194 Wn.2d at 778.

12

     State Farm argues that the typical negotiation deduction is nevertheless permitted because

13

it is "itemized and verifiable." This argument fails for two reasons. First, even if the deduction

14

was itemized and verifiable, it is not permitted by Section 391(4)(b) and is therefore an

15

impermissible deduction. Second, the deduction is neither itemized nor verifiable. The Court

16

defined the terms "itemized" and "verifiable" as follows: "Merriman Webster defines the term

17

'itemized' as 'to set down in detail or by particulars; list' and defines 'verifiable' as to be able to

18

'establish the truth, accuracy or reality of.'" (Order on MTD at 13 (citation and quotation

19

omitted).) The Autosource Report buries the negotiation deduction in fine print in its explanation

20

of the comparable vehicles and provides no "detail" or "particulars" as to why it is included.

21

More importantly, there is nothing in the Autosource Report that would allow a consumer to

22

know whether the amount attributed to this deduction is accurate or true. At most, the insured is

23

able to know the amount of the deduction, but not the basis for its inclusion or its accuracy in

24

determining value. Thus, this argument falls far short of defeating liability.

### c.    Evidence of Injury

The Parties dispute whether Plaintiffs have demonstrated an injury individually and on a class-wide basis, as required by the CPA. The Court finds that Plaintiffs have proven individual and classwide injury.

The Ninth Circuit provided substantial guidance on the question of injury and damages. The Court "conclude[d] that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount." (Jama, Slip Op. at 19.) The Court further explained: "Nothing in Lara precludes common proof of injury as the amount of State Farm's estimates less the impermissible deduction as to the class of owners who were paid the Autosource valuation." (Id. at 22-23.) The Court also suggested that "that class members could measure their injuries on a class-wide basis by adding back to the value of their vehicles as calculated in the Autosource reports the amount of the unlawful negotiation discount." (Id. at 19.) In so holding, the Ninth Circuit explained:

> Indeed, State Farm itself used the Autosource reports as one proper measure of actual cash value. And ample evidence provided by State Farm itself demonstrated how the Autosource reports were prepared and why they provided an accurate measure of the pre-crash actual cash value of drivers' cars. We see no reason why a plaintiff seeking to prove injury cannot rely on the Autosource reports themselves to establish value, minus the unlawful negotiation adjustment.

(Id. at 26.) But the Court also explained that "the district court should evaluate anew whether the named Plaintiffs have adduced sufficient evidence of injury consistent with this opinion." (Id. at 25-26.)

Plaintiffs here have provided unrebutted evidence that the negotiation deduction taken by State Farm through the Autosource Reports constitutes the injury at issue. State law mandates that insureds receive an ACV that complies with state regulations. WAC 284-30-391(b)(2). Here,

1   the Court has determined that State Farm violated this provision by applying a negotiation

2   deduction that is impermissible. Plaintiffs, for their part, have shown uncontested evidence that

3   the ACV calculation contained in the Autosource Reports otherwise complies with the insurance

4   regulations and therefore produce an accurate and compliant ACV. Although Plaintiffs have not

5   provided outside evidence, they have always maintained that aside from the negotiation

6   deduction, the Autosource Reports comply with the Washington insurance regulations and set an

7   accurate ACV. (See, e.g., Pls. Reply at 1.) And while State Farm insists that the negotiation

8   deduction is permitted by state law, it agrees that the Autosource ACV methodology complies

9   with state law. As State Farm has explained, "it is basically undisputed that Autosource uses

10  comparable vehicles within WAC parameters, as Plaintiffs' own Autosource Reports confirm."

11  (Def. Opp. at 14.) The Ninth Circuit, too, noted the "ample evidence provided by State Farm

12  itself demonstrated how the Autosource reports were prepared and why they provided an

13  accurate measure of the pre-crash actual cash value of drivers' cars." (Jama, Slip Op. at 25.) This

14  is evident from Autosource's declarant, Neal Lowell, who explains how Audatex identifies

15  comparable vehicles in compliance with the Washington insurance regulations. (Lowell Decl. ¶¶

16  14-17, 37 (Dkt. No. 86).) He also asserts that Audatex has confirmed "the accuracy of its

17  valuation process, including its accuracy in calculating the actual cash value of cards advertised

18  and sold in the State of Washington." (See id. ¶ 38 (pointing to a studies that Lowell claims

19  confirmed the "fairness and accuracy of the Autosource valuation tool.").) Additionally, while

20  certainly not dispositive, the Court finds it relevant that State Farm has "preemptively stopped

21  adjusting for typical negotiation in light of the Court's class certification ruling," which indicates

22  that the Autosource Reports without the negotiation deduction produce an accurate and WAC-

23  compliant ACV. (Dep Opp. at 21.) In sum, there are no disputed facts that the Autosource

24

1    Reports without the negotiation deduction set an accurate and state-law-compliant ACV. From

2    this, it follows naturally that the Plaintiffs and Class were injured in the amount taken for the

3    negotiation deduction, as they should have received the full ACV set by the Autosource Reports

4    without the impermissible deduction.

5            The Court also notes that Plaintiffs were not required to adduce additional evidence to

6    confirm that the Autosource Reports without the negotiation deduction reach an accurate ACV.

7    As the Ninth Circuit explained that "[n]othing in Lara required (as the district court appeared to

8    believe) '[p]laintiffs [to] undertake[] a[] separate valuation process or retain[] an expert to opine

9    on the value of the loss vehicles.'" (Slip Op. at 25-26.) The Court heeds this admonition, which

10   makes sense given the uncontroverted evidence showing the Autosource Reports arrive at

11   accurate and state-law compliant ACVs without the negotiation deduction.

12           State Farm has offered no competent evidence to suggest that the Autosource Reports

13   without the deduction erroneously determine the ACV for Plaintiffs and the Class. In opposing

14   Plaintiffs' Motion for Summary Judgment, State Farm did little more than argue that it "can

15   defend Plaintiff's claims by presenting contrary evidence." (Def. Opp. at 5.) The sole evidence

16   State Farm cited are eleven paragraphs of the declaration of Neal Lowell and an exhibit to his

17   declaration. (Id. (citing (Lowell Decl. ¶ 19-20, 30-38 & Ex. 1).) The Court reviews the three

18   points Lowell makes in these paragraphs and finds that they do not raise a dispute of fact as to

19   value to support State Farm position.

20           First, Lowell explains that "Audatex has seen that used vehicles are typically sold for less

21   than the advertised asking price," and to avoid overvaluing the comparable vehicles, it "adjusts

22   the value of the advertised asking prices of comparable vehicles to account for the difference

23   between the vehicle's asking price and likely selling price." (Lowell Decl. ¶¶ 19-20.) But Lowell

24

1    does not tie this belief to the ACV reached for any of the named Plaintiffs' or the Class's

2    vehicles. He has not offered evidence that without the negotiation deduction the ACV identified

3    in the Plaintiffs' and Class's Autosource Reports reach an inaccurate ACV. This does not raise a

4    dispute of fact to support State Farm's opposition.

5         Second, Lowell explains how Audatex tests and adjusts the negotiation discount based on

6    various data. (Id. ¶¶ 30-38.) But as with the prior statement, Lowell does not provide evidence

7    that the Autosource Reports for Plaintiffs or the Class Members incorrectly determined the ACV

8    if one does not include the negotiation deduction. This statement does not raise a dispute of

9    material fact.

10        Third, Lowell invokes a statistical study it commission that he believes shows that the

11   Autosource model accurately determines ACV with a negotiation deduction and, if anything,

12   overvalues vehicles in favor of the insured. (Lowell Decl. ¶ 38.) The study was prepared by

13   Professor James Levinsohn who "evaluat[ed] the accuracy of the Autosource actual cash model

14   in the Washington state-wide market from July 2015 through December 2015" to determine

15   "whether the Autosource model accurately predicts the market value of vehicles, and . . . whether

16   there is any persuasive evidence that the Autosource model systematically undervalues vehicles."

17   (Lowell Decl. Ex. A at 1, 3-4.) After looking at the data, Levinsohn concluded that "the

18   Autosource ACV model accurately predicts the market values of Washington vehicles to a

19   reasonable degree of statistical certainty." (Id. at 8.) He also observed "on average the model

20   values [vehicles] approximately 8.8% above the price for which they actually sold." (Id. at 8.)

21   The Court is not convinced that this raises a dispute of fact as to injury. Levinsohn does not

22   explain whether the model he tested included a negotiation deduction or not. This is fatal to

23   Lowell's belief that Levinsohn has somehow opined on the accuracy of an ACV that includes a

24

negotiation deduction. Nor does Levinsohn make any observations about the need for a

negotiation deduction to render an accurate ACV. And while Levinsohn noted that the model

overvalues cars, he nevertheless concluded that ""the Autosource ACV model accurately

predicts the market values of Washington vehicles to a reasonable degree of statistical certainty."

(Id. at 8.) Additionally, Levinsohn's report is based on limited data predating the start of the

Class Period (March 2016), which State Farm has not linked to the ACVs reached for Plaintiffs

and the Class Members. Levinsohn's study does not suffice to raise a genuine issue material fact

as to injury and damages. In sum, nothing in Lowell's declaration identifies a dispute concerning

facts material to the Court's determination.

　　　　In its supplemental brief, State Farm newly argues that backing out the negotiation

deduction from the Autosource Report does not result in state-law compliant ACV. (See Supp.

Br. at 5-6.) State Farm's argument has no merit. First, as to Ngethpharat, State Farm points out

that the second Autosource Report used to value Ngethpharat's vehicle could not comply with

the advertised data-comparison methodology set out in Section 391 because it used dealer

quotes. (Id. at 5.) This is a distinction without a difference. As explained in the subsection "e,"

below, State Farm violated the two-dealer regulations in valuing Ngethpharat's vehicle, and

Plaintiffs do not argue that this second Autosource Report is WAC-compliant. Second, as to

Kelley, State Farm claims that his Autosource report does not comply with state regulations if

one backs out the negotiation deduction because it contains only one comparable vehicle, while

the "advertised data comparison" valuation  method requires two cars. (Id. at 5.) This argument

fails to recognize that the valuation can be based on a single vehicle provided that "[t]he actual

cash value of a comparable motor vehicle based on current data obtained in the area where the

loss vehicle is principally garaged." WAC 284-30-391(2)(b)(i). The comparable car was within

Kelley's postal code (meeting the proximity requirements of the WAC) and the Autosource report states that the valuation "was processed using our Single Comparable valuation methodology." (Dkt. No. 187-2 at 3-4.) Indeed, at oral argument, State Farm conceded that Kelley's Autosource Report tracked this WAC-compliant methodology. As such, these arguments fail to raise any barrier to summary judgment in Plaintiffs' favor.

Having considered all of the evidence on which State Farm relies, the Court finds no dispute of fact that the Autosource Report without the negotiation deduction reaches a correct ACV Plaintiffs Kelley, Jama, and the Class Members. Thus, the Court finds uncontested evidence of injury in the amount taken as the negotiation deduction.

### d.    Damages to Jama, Kelley, and the Classes

Consistent with the Court's injury analysis, Plaintiffs have provided evidence classwide damages.

As the Court previously held, "[i]f Plaintiffs are correct that the negotiation discount is impermissible, then the proper measure of damages is the refund of the negotiation discount and related sales tax." (Order on Class Cert at 22 (Dkt. No. 136).) Having now concluded that the negotiation discount is impermissible and the injury, the Court finds that Plaintiffs have demonstrated a reasonable means of calculating damages and evidence of classwide damages. Plaintiffs rely on an expert economist, Paul Torelli, Ph.D., who calculated average damages for the class using data provided by State Farm. Torelli identified a class of 78,214 who were paid a value that included the negotiation deduction during the class period (which started on March 25, 2016 in <u>Kelley</u> and March 10, 2016 in <u>Jama</u>) until September 13, 2021, when State Farm stopped using the negotiation deduction. (Torelli Decl. ¶ 18. (Dkt. No. 180).) He adjusted the class to remove those few who opted out from the Class. (<u>Id.</u>) Torelli then determined the average negotiation deduction and applicable tax. (<u>Id.</u> ¶ 20.) He determined that the classwide damages

1    for the Kelley class to be $48,520,015.61 and $6,130,579.67 for the Jama class. (Id. ¶ 25.) These

2    sums reflect the average damage plus tax at confidence interval at the 95th percentile. (Id.)

3        State Farm presents no evidence in opposition to the damages calculation that Plaintiffs'

4    expert reached or any information as to damages. (See Def. Opp. to MSJ at 15-17.) Instead, State

5    Farm argues that there were no damages, as evidenced by the Ninth Circuit's decision in Lara.

6    But the Ninth Circuit has rejected this theory, and the Court does not find any merit in it.

7    Without competing damages calculations or contrary expert opinion, State Farm has failed to

8    raise a dispute of fact as to the damages calculations. As such, the Court finds that the Classes

9    are entitled to $54,650,595.28 ($48,520,015.61 for the Kelley class and $6,130,579.67 for the

10   Jama class).

11       But the Court agrees with State Farm that Plaintiffs are not entitled to prejudgment

12   interest on the Classes' claims. Under applicable Washington law, prejudgment interest is only

13   available on liquidated damages. See Hansen v. Rothaus, 107 Wn.2d 468, 470-73 (1986). "A

14   'liquidated' claim is a claim where the evidence furnishes data which, if believed, makes it

15   possible to compute the amount with exactness, without reliance on opinion or discretion." Id.at

16   472 (citation and quotation omitted). "An unliquidated claim, by contrast, is one where the exact

17   amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or

18   undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or

19   jury as to whether a larger or a smaller amount should be allowed." Id. at 473 (citation and

20   quotation omitted). Here, Plaintiffs have failed to show that classwide CPA damages are

21   liquidated. Torelli calculated classwide damages based on an average negotiation deduction

22   using several statistical assumptions and his own mathematical expertise. Moreover, he used

23   only a sample of claim files to determine the average negotiation deduction that he then mapped

24

to the Classes. Torelli's calculations are not based on the amount of negotiation deduction taken on each Autosource Report, which would be a liquidated amount. Instead, Torelli's classwide calculation is precisely the kind that "depend[s] upon the opinion or discretion" and not exactness, which renders the claim unliquidated for which prejudgment is not proper. Hansen, 107 Wn.2d at 473 (citation and quotation omitted). The Court awards no prejudgment interest. As a result, the Court also DENIES as MOOT Defendants' request to strike Torelli's supplemental declaration (Dkt. No. 199), as the Court need not consider its discussion of prejudgment interest that remains unavailable.

### e.    Liability on Ngethpharat's CPA Claim

Ngethpharat argues that State Farm incorrectly determined the ACV of her car by using a "two-dealer quote" that deviated from the WACs. The Court agrees.

Section 391 allows an insurer determine ACV through "[l]icensed dealer quotes" which are described as: "[q]uotations for the cost of a comparable motor vehicle obtained from two or more licensed dealers within a reasonable distance of the principally garaged area not to exceed one hundred fifty miles (except where there are no licensed dealers having comparable motor vehicles within one hundred fifty miles)." WAC 284-30-391(2)(b)(ii). When using this methodology, "the insurer must: . . . (b) Base all offers on itemized and verifiable dollar amounts for vehicles that are currently available, or were available within ninety days of the date of loss, using appropriate deductions or additions for options, mileage or condition when determining comparability." WAC 284-30-391(4)(b).

State Farm here settled Ngethpharat's claim by obtaining two quotes from dealers within 150 miles of Ngethpharat's "principally garaged area." According to State Farm, the "two dealers concluded that they would likely sell a comparable vehicle matching the description of Ms. Ngethpharat's totaled vehicle for $13,900 and $13,995, which Autosource averaged for an

1    actual cash value of $13,948." (Def. Opp. at 23 (citing Herzog Decl. Ex. 29 at 111-12 and Ex.

2    36).) The two pieces of evidence backing this statement are as follows. First, the Autosource

3    Rule 30(b)(6) deponent, Lowell, testified that "those two dealers said that they would expect to

4    sell that vehicle for the amount on their lot." (Lowell Dep. at 111-12.) Second, the Autosource

5    Report merely confirms that the two dealers were contacted, not that they were currently selling

6    such cars.

7         The Court agrees with Ngethpharat that the two-dealer quote State Farm utilized violated

8    the insurance regulations because the quotes did not actually have "vehicles that are currently

9    available" on which they based their quotes. This plainly violates Section 391(4)(b). State Farm

10   suggests that it would be improper to read Section 391(4)(b)'s requirement into the two-dealer

11   quote formula. But this argument ignores the fact that Section 391(4)(b) expressly states that

12   "[w]hen settling a total loss vehicle claim using methods in subsections (1) through (3) of this

13   section," which includes the two-dealer quote method, "the insurer <u>must</u>" follow Section (4)(b).

14   WAC 284-30-391(4)(b) (emphasis added). This undermines State Farm's position, which the

15   Court rejects.

16        As to injury and damages, the Court agrees with Ngethpharat that she has identified an

17   ACV to which the Court can measure damages and injury. She argues that the first Autosource

18   Report she received that included a negotiation deduction accurately measured the ACV if one

19   adds back in the negotiation deduction. The ACV set by the Autosource Report without the

20   negotiation deduction is $14,297.75, but Ngethpharat received only $13,948 based on the second

21   Autosource report using the two-dealer-quote methodology. This shows that Ngethpharat was

22   paid $349.75 less than she was owed had State Farm used an accurate and state-law-compliant

23   ACV. And, including taxes, State Farm injured her in the amount of $385.77. The Court finds

24

this evidence of damages and awards her summary judgment on this claim in the amount of

$385.77. And although Ngethpharat might be entitled to prejudgment interest, Plaintiffs have not

requested any such relief.

####       f.       Agreed Value Defense

State Farm seeks to avoid liability on Plaintiffs' CPA claims by contending that each

insured here agreed to the ACV that the Autosource reports produced and this means State Farm

complied with state law. The Court disagrees.

As the Court explained in its Order on Class Certification, an ACV that deviates from

Section 391's methodology may still be compliant if the insurer and insured reach an agreement

that expressly acknowledges that the value arrived at or methodology used otherwise does not

comply with the settlement methodologies of Section 391(1)-(3). (Class Cert. Order at 13.) And

the agreement must also be documented in the claim file. (Id. (citing WAC 284-30-391).) The

Court also concluded that "because this safe harbor acts as an affirmative defense, State Farm

bears the burden of showing that there is evidence of consent in the class and that this issue could

impact commonality." Id. (citing True Health Chiropractic, Inc. v. McKesson Corp., 896 F.3d

923, 932 (9th Cir. 2018) (noting that the defendant bears the burden of providing evidence of

predominance-defeating consent to a TCPA claim).)

State Farm has not provided evidence that any of the named Plaintiffs specifically agreed

to the Autosource Report's use of a negotiation deduction. As to Kelley, the claims file just

shows he cashed the check, not that he agreed to the negotiation deduction. And the evidence

State Farm cites to from the claim file just shows he received the Autosource Report and

accepted payment, not that he agreed to the value and the deviation from Section 391 as to the

negotiation discount. (See Def. Opp. at 7 (citing Exs. 2, 6-9 of Herzog Decl.).) This does not

satisfy the safe harbor. As to Jama, the claim file also lacks any evidence of an agreement to the

use of the condition adjustment. As State Farm explains, Jama has, in fact, had three total loss

settlements with State Farm from 2019 through 2021. As to the first total loss, the claim file

states:

> "RCF [Received Call From] Anna from the Law offices of Daniel Whitmore the NI's [Named Insured's] attorney's office stating the NI [Named Insured] wants to settle out the claim … Value Accepted (Y/N):Y."

(Declaration of Douglas Graff ¶ 23 & Ex. B (Dkt. Nos. 84 & 84-2).) But these call notes just

show that Jama wanted to be paid on the claim (e.g., they state "Settlement Accepted: Y" with no

detail), not that he agreed to the use of the negotiation deduction. (See, e.g., Herzog Decl. Ex. 20

at 3.) Similarly, the claim files for the other vehicles do not show any discussion about the

negotiation deduction or an agreement to its use. Rather, they show that Jama accepted payment,

but did not express any agreement or acknowledgement about the deduction. Lastly, as to

Ngethpharat, State Farm makes no argument that she reached an agreed value.

The Court finds that State Farm has failed to show that any of the Plaintiffs agreed to the

use of either deduction such that their claims may be barred.

### g. Jury Trial on Enhanced CPA Damages

The Parties dispute whether the Court or a jury must determine whether Plaintiffs are

entitled to enhanced damages under the CPA. The Court agrees with State Farm that a jury must

do so.

### i. Seventh Amendment Legal Standard

Applicable only to federal courts, the Seventh Amendment guarantees a right to a jury on

"suits at common law." U.S. Const. Art. VII; see R.J. Reynolds Tobacco Co. v. Shewry, 423

F.3d 906, 924 (9th Cir. 2005) ("[T]he Seventh Amendment's guarantee of the right to a civil trial

by jury does not apply to the states[.]"). Although one could simply read out statutory causes of

action, the Supreme Court has read the term "suit at common law" far more expansively,

1    distinguishing instead between legal and equitable claims. As the Supreme Court has explained,

2    "[t]he right to a jury trial includes more than the common-law forms of action recognized in

3    1791; the phrase 'Suits at common law' refers to 'suits in which legal rights [are] to be

4    ascertained and determined, in contradistinction to those where equitable rights alone [are]

5    recognized, and equitable remedies [are] administered.'" <u>Chauffeurs, Teamsters & Helpers, Loc.</u>

6    <u>No. 391 v. Terry</u>, 494 U.S. 558, 564 (1990) (quoting <u>Parsons v. Bedford</u>, 3 Pet. 433, 447, 7 L.Ed.

7    732 (1830)).

8         To know whether the Seventh Amendment applies or not, the Court must therefore

9    determine whether the action and relief are legal or equitable in nature. "To determine whether a

10   particular action will resolve legal rights, we examine both the nature of the issues involved and

11   the remedy sought." <u>Chauffeurs</u>, 494 U.S. at 565. "First, we compare the statutory action to 18th-

12   century actions brought in the courts of England prior to the merger of the courts of law and

13   equity." <u>Tull v. United States</u>, 481 U.S. 412, 417 (1987) (citations omitted). "Second, we

14   examine the remedy sought and determine whether it is legal or equitable in nature." <u>Id.</u> at 417–

15   418 (citations omitted). "The second inquiry is the more important in our analysis." <u>Chauffeurs</u>,

16   494 U.S. at 565.

17              **ii.    Seventh Amendment Requires Jury Trial**

18         In answering the two inquiries set out in <u>Chauffeurs</u>, the Court finds that enhanced CPA

19   damages are legal in nature and must be determined by the jury.

20         As first inquiry, there does not appear to be a dispute that the CPA presents a legal claim,

21   not an equitable one. Although the CPA is a creature of state statute, Plaintiffs make no argument

22   that the cause of action has only parallels to equitable claims. Instead, they argue that "no one is

23   suggesting that liability and 'actual damages' under the CPA . . . would not be jury issues were

24

1    factual determinations still at issue[.]" (Pl. Supp. Brief at 4.) This is unsurprising, given that the

2    CPA claim has parallels to common law claims of fraud and misrepresentation. Without any

3    dispute on this issue, the Court finds this inquiry leans in favor of requiring a jury to determine

4    enhanced damages.

5         As to the second inquiry, the Court finds that enhanced damages are a legal remedy that

6    must be decided by the jury. This conclusion requires a brief review of federal jurisprudence on

7    the nature of punitive/enhanced damages and Washington State Courts' interpretation of the

8    purpose behind the CPA's enhanced damages provision. The Court then explains why Plaintiffs

9    incorrectly analogize the CPA's enhanced damages to a civil penalty under the Clean Water Act,

10   and why the Court's determination here accords with existing decisions of this District

11   considering a similar enhanced damages statutory provision.

12        Federal jurisprudence endorses the view that enhanced damages are legal in nature.

13   "Generally, an action for money damages was 'the traditional form of relief offered in the courts

14   of law.'" Chauffeurs, 494 U.S. at 570 (quoting Curtis v. Loether, 415 U.S. 189, 196 (1974)).

15   "Remedies intended to punish culpable individuals, as opposed to those intended simply to

16   extract compensation or restore the status quo, were issued by courts of law, not courts of

17   equity." Tull, 481 U.S. at 422 (citing Curtis, 415 U.S. at 197 (holding that punitive damages

18   remedy is legal, not equitable) and Ross v. Bernhard, 396 U.S. 531, 536 (1976) (holding that a

19   treble-damages remedy for securities violation is a penalty, which constitutes legal relief)). As

20   the Court in Tull noted, the deterrent and retributive nature of a treble damages provision is legal

21   in nature. Tull, 481 U.S. at 423. By contrast, disgorgement of profits or restitution have been

22   framed as equitable. Id. at 422.

23

24

1     Washington courts have generally concluded that the CPA's provision for enhanced

2   damages serves legal, not equitable ends. In a case overruled on other grounds, the Court of

3   Appeals explained that the CPA's enhanced damages seek to redress the following non-exclusive

4   concerns: "(1) financial rehabilitation of the injured consumer, (2) encouraging private citizens

5   to bring actions benefiting the public, (3) deterrence, and (4) punishment." Sing v. John L. Scott,

6   Inc., 83 Wn. App. 55, 71 (1996), rev'd, 134 Wn.2d 24 (1997) (remanding for further proceedings

7   having found a lack of unfair or deceptive act or practice). In another opinion, the Court of

8   Appeals similarly endorsed the notion that treble damages "'are designed to . . . [provide]

9   sufficient financial rewards to victorious consumers on two levels: (1) on the individual level, to

10  enable the injured plaintiff to pursue his own claim; and, (2) on the public level, to reimburse the

11  individual plaintiff and his counsel for enforcing the Act on behalf of the general citizenry.'" St.

12  Paul Fire & Marine Ins. Co. v. Updegrave, 33 Wn. App. 653, 658 (1983) (quoting Comment,

13  Reasonable Attorneys' Fees and Treble Damages—Balancing the Scales of Consumer Justice, 10

14  Gonz. L. Rev. 593, 598 (1975)). This tracks the Washington Supreme Court's determination that

15  the CPA's treble damages are penal in nature, although that determination was made in the

16  context of examining the retroactivity of the CPA. See Mason v. Mortgage Am., Inc., 114 Wn.2e

17  842, 855 (1990); see also Nyby v. Allied Fid. Ins. Co., 42 Wn. App. 543, 548 (1986) ("[T]he

18  treble damage provision is penal in nature[.]")

19     Additionally, because the CPA directs courts to consider federal antitrust jurisprudence to

20  determine its scope, the Court notes that federal antitrust treble damages have been found to be

21  legal in nature, too. See RCW 19.86.920; State v. Ralph Williams' N. W. Chrysler Plymouth,

22  Inc., 82 Wn.2d 265, 271 (1973) (citing RCW 19.86.920 and applying federal case law on

23  injunctive relief to determine scope of CPA's reach). The Supreme Court has explained that

24

1   treble damages for Sherman Act violations counter-balance the difficulty in maintaining a private

2   suit, deter future violations, and compensate victims. See Am. Soc. of Mech. Eng'rs, Inc. v.

3   Hydrolevel Corp., 456 U.S. 556, 574–76 (1982). These are core legal remedies. See Tull, 481

4   U.S. at 422-23. The Supreme Court has also explained that the treble damages provision in the

5   Sherman Act "were provided in part for punitive purposes, but also to make the remedy

6   meaningful by counterbalancing 'the difficulty of maintaining a private suit against a

7   combination such as is described' in the Act." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429

8   U.S. 477, 486 n.10 (1977)  (quoting legislative history). In other words, treble damages are "an

9   important means of enforcing the law." Id. The purpose behind enhanced damages under the

10  Sherman Act align with those of the CPA, as noted in Sing, and further highlight why they are

11  legal in nature, not equitable.

12          Given the above federal and state jurisprudence on the nature of treble damages and the

13  scope and purpose of the CPA's enhanced damages, the Court finds that the CPA's enhanced

14  damages provision is legal in nature, and not equitable. The CPA's enhanced damages

15  encourages lawsuits to vindicate consumer rights, deter bad behavior, and punish wrong-doers.

16  These are legal remedies, not equitable ones. See Tull, 481 U.S. at 422-23. The Court finds no

17  evidence that the CPA's enhanced damages is intended to serve any equitable concerns, such as

18  restitution or disgorgement.

19          Plaintiffs unconvincingly argue that the CPA's enhanced damages are just like the Clean

20  Water Act's civil penalty remedy at issue in Tull, which the Supreme Court found to require an

21  equitable determination by the court, not a jury. Plaintiffs' argument falls apart because of the

22  divergence between the civil penalty provision of the Clean Water Act and enhanced damages

23  under the CPA. In Tull, the Supreme Court considered the narrow question of whether civil

24

1    penalties under the Clean Water Act could be decided by the judge, rather than the jury. 481 U.S.

2    at 426-27. The civil penalty provision stated that "the court shall consider the seriousness of the

3    violation or violations, the economic benefit (if any) resulting from the violation, any history of

4    such violations, any good-faith efforts to comply with the applicable requirements, the economic

5    impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. §

6    1319(d). The Court held that although the civil penalty was legal in its scope—given that it

7    sought to impose a penalty that amounted to both retribution and deterrence—Congress could

8    delegate the determination to the Court without running afoul of the Seventh Amendment. Tull,

9    481 U.S. at 423, 426-27. The Court noted that Congress delegated its authority to assess civil

10   penalties to the Court, which requires "highly discretionary calculations that take into account

11   multiple factors," which are "the kinds of calculations traditionally performed by judges." Id. at

12   427. Here, however, the CPA's enhanced damages provision is not a civil penalty—indeed, the

13   CPA has an entirely separate provision for civil penalties—RCW 19.86.140. More importantly,

14   unlike the CWA, the CPA does not circumscribe the methodology or factors to be considered in

15   determining enhanced damages. The Court finds no parallels between the two statutes on this

16   key issue, which renders Tull inapposite.

17        The Court further notes that the outcome here tracks jurisprudence from this District on

18   the nearly identical enhanced damages provision of Washington's Insurance Fair Conduct Act

19   (IFCA). See F.C. Bloxom Co. v. Fireman's Fund Ins. Co., No. C10-1603RAJ, 2012 WL

20   5992286, at *4 (W.D. Wash. Nov. 30, 2012). Both IFCA and the CPA contain indistinguishable

21   enhanced damages provisions. Compare RCW 19.86.090 ("the court may, in its discretion,

22   increase the award of damages up to an amount not to exceed three times the actual damages

23   sustained") with RCW 48.30.015(2) ("The superior court may, after finding that an insurer has

24

1    acted unreasonably in denying a claim for coverage or payment of benefits or has violated

2    [IFCA], increase the total award of damages to an amount not to exceed three times the actual

3    damages."). Considering the language of IFCA and the same Seventh Amendment framework as

4    outlined above, the Court in F.C. Bloxom concluded that "IFCA's damages remedy is legal, not

5    equitable." F.C. Bloxom, 2012 WL 5992286, at *4. The Court explained that "[c]laims for

6    monetary remedies are generally legal," and this "general rule extends to discretionary monetary

7    relief, including monetary relief intended as punishment," including "IFCA's enhanced damages

8    remedy." Id. (citing Feltner v. Columbia Pictures Television, Inc., 523 U.S. 340, 352 (1998)).

9    This same reasoning accords with an unpublished Ninth Circuit decision, finding that IFCA's

10   enhanced damages are to be decided by a jury, not the court. MKB Constructors v. Am. Zurich

11   Ins. Co., 711 F. App'x 834, 838 (9th Cir. 2017); see also Larsen v. PTT, LLC, C18-5275 TMC,

12   Dkt. No. 628 at 7 (W.D. Wash. June 11, 2025) (finding that "the enhanced damages provision of

13   the CPA is subject to the Seventh Amendment's jury trial right," though the parties agreed to this

14   proposition). These decisions lend further support for the Court's conclusion that the CPA's

15   enhanced damages are to be decided by the jury.

16        The only decision the Court is aware of to reach a different conclusion is Anderson v.

17   State Farm Fire & Cas. Co., No. 3:20-CV-05119-DGE, 2024 WL 3598505 (W.D. Wash. July 31,

18   2024). In that CPA case, the Court distinguished IFCA-specific case-law that found enhanced

19   damages to be a jury question on the theory that they "are not applicable because they discuss

20   jury-awarded enhanced damages under the Insurance Fair Conduct Act pursuant Washington

21   Revised Code § 48.30.015(2) rather than court-awarded treble damages under the CPA pursuant

22   to § 19.86.020." Id. at *1. But Anderson undertakes no comparative analysis or explanation as to

23   how the statutes diverge either by their plain language or their legislative history. Here, the Court

24

1    finds no functional difference, and any linguistic differences are irrelevant to the nature of the

2    damages provision. The decision in <u>Anderson</u> also concluded that "[t]reble damages are not

3    punitive damages; rather, they are statutory liquidated damages." <u>Id.</u> (citing <u>Segar v. Allstate Fire</u>

4    <u>and Casualty Ins. Co.</u>, No. C21-1526JLR, 2022 WL 102035, at *4 n.8 (W.D. Wash. Jan. 11,

5    2022)). This conclusion, too, is unpersuasive, as it relies on a footnote from an unpublished

6    decision analyzing whether the amount in controversy for diversity jurisdiction purposes could

7    include treble damages under the CPA. <u>Segar</u>, 2022 WL 102035, at *4 n.8. The Court in <u>Segar</u>

8    was not engaged in an analysis of the nature of the enhanced damages remedy, as doing so was

9    far afield of the inquiry before the Court. Thus, <u>Segar</u> is not solid support for the proposition that

10    enhanced damages under the CPA are equitable. And <u>Anderson</u> undertook no analysis of the two

11    <u>Chauffeurs</u> factors to help support its decision. In sum, the Court does not find the reasoning in

12    <u>Anderson</u> persuasive.

13        Based on the Court's analysis of the various appliable law, the Court finds that the jury

14    must determine any enhanced damages under the CPA.

15        In reaching this decision, the Court has not considered the declaration from Mary Owen,

16    which Plaintiffs offer solely to support their request that the Court enter an award for enhanced

17    damages at summary judgment. Because a jury must decide this issue at trial, the Court DENIES

18    as MOOT State Farm's Motion to Exclude Owen's Declaration. Given the Court's conclusion on

19    the Seventh Amendment issue, it had no reason to consider Owen's declaration and has not done

20    so. Should Owen be called to testify at trial, the Court will resolve any disputes about the

21    admissibility of her testimony through motions in limine and as objections arise at trial.

22

23

24

1

### 2.      Breach of Contract Claim

2        Plaintiff also seek summary judgment on their breach of contract claims, which are

3    premised on the notion that the Washington insurance regulations are made part of their insuring

4    agreements. For this proposition, Plaintiffs cite to a Washington Supreme Court decision that

5    concluded "a valid statute becomes a part of and should be read into the insurance policy."

6    Touchette v. Nw. Mut. Ins. Co., 80 Wn.2d 327, 332 (1972). But as State Farm points out, this

7    holding has never been extended to insurance regulations. Indeed, this District has rejected

8    adopting such "a novel and sweeping theory" because doing so "would grant a private right of

9    action for any violation of the insurance code." E.S. v. Regence BlueShield, No. 2:17-cv-01609-

10   RAJ, 2022 WL 279028, at *10-11 (W.D. Wash. Jan. 31, 2022). And only other case Plaintiffs

11   cite merely presumes the insurance regulations are made part of the insuring agreement without

12   any analysis or even reference to Touchette. See Williams v. GEICO Gen. Ins. Co., 497 F. Supp.

13   3d 977, 982 (W.D. Wash. 2020). What is more, Plaintiffs fail to respond to State Farm on this

14   issue in their Reply, which appears a concession that State Farm's position has merit. Regardless

15   of Plaintiffs' omission, the Court here finds no merit to Plaintiffs' position that all insurance

16   regulations are incorporated into the insuring agreements. The Court agrees with the reasoning

17   E.S. v. Regence, that Plaintiffs' position would stretch Touchette beyond its express limitation to

18   statutory provisions, and it would unreasonably create a contractual right of action for any

19   violation of the insurance WACs. As such, the Court DENIES Plaintiffs' Motion on the breach

20   of contract claims. But the Court also notes that because State Farm has not moved for summary

21   judgment, the Court cannot affirmatively grant summary judgment in State Farm's favor on the

22   claim.

23

24

1    **C.    State Farm's Motion for Summary Judgment**

2         State Farm seeks partial summary judgment on three different statutes of limitation

3    grounds. First, it argues that the Classes' breach of contract claims may only reach back one year

4    because of a contractual provision. Second, it argues that the CPA claims can only reach back

5    four years. Third, it argues that Jama's bad faith claims are subject to a three-year statute of

6    limitations. The Court agrees with State Farm and GRANTS its Motion on all three issues.

7         **1.    Statute of Limitations on Breach of Contract**

8         State Farm argues that its insuring agreements all include a "Legal Action Clause," which

9    requires the insured to bring suit within one year of the date of the loss. (Mot. at 13.) The Legal

10   Action Clause states:

11        Legal action may not be brought against us until there has been full compliance with all
          the provisions of this policy. In addition, legal action may only be brought against us
12        regarding: … Physical Damage Coverages if the legal action relating to these coverages
          is brought against us within one year immediately following the date of the accident or
13        loss.

14   (Declaration of Kevin Nicklas ("Nicklas Decl."), ¶ 5 & Ex. A at 42-43.)

15        The Court agrees with State Farm that this provision applies. Here, Ngethpharat

16   commenced this action on March 25, 2020, and this tolled the statute of limitations for the class

17   that Kelley now represents. Applying this provision means that Kelley Class claims cannot reach

18   back further than a date of loss before March 25, 2019. Similarly, Jama commenced his action on

19   March 10, 2020, meaning that the Jama Class claims cannot reach back beyond March 10, 2019.

20        The Court rejects Plaintiffs' many arguments in opposition. First, Plaintiffs incorrectly

21   argue that the Legal Action Clause does not apply, theorizing that their claims are for

22   underinsured motorist coverage. (See Opp. at 12-13.) But the coverage here arises out of the

23   policy's Physical Damage Coverages (PD), not the Underinsured Motor Vehicle Property

24   Damage Coverage (UMPD). (Niklas Decl. Ex. A at 25-36.) Only the PD Coverage offers actual

1    cash value for total loss vehicles under its collision coverage. (See Niklas Decl. Ex. A at 32

2    (agreeing to "pay the actual cash value of the covered vehicle minus any applicable deductible"

3    within the PD coverage).) The UMDP Coverage, on the other hand, only provides for

4    compensatory damages for property damages without any reference to actual cash value. This

5    undermines Plaintiffs' argument.

6         Second, Plaintiffs argue that the contractual provision should not apply because State

7    Farm waived the provision. But this argument rests on a misreading of State Farm's deponent's

8    testimony. Plaintiff claims that State Farm's 30(b)(6) deponent testified that the insured's receipt

9    of ACV does not bind the insured from pursuing other actions. (Opp. at 13-14 (quoting Graff

10   Dep. at 179-81).) But the deponent did not make a binding statement that the provision does not

11   apply. Instead, he reaffirmed that the contract's time limits applied distinctly from a statute of

12   limitations. (Graff Dep. at 182.) This undermines Plaintiffs' argument.

13        Third, Plaintiffs argue that State Farm should be equitably estopped from invoking the

14   contractual limitation. But Plaintiffs cite to no authority that equitable estoppel will apply to a

15   contractual limitations. More importantly, they have not identified a factual basis for estoppel,

16   which requires "[a]n admission, statement, or act inconsistent with the claim afterwards

17   asserted." Safeco Ins. Co. of Am. v. Butler, 118 Wn.2d 383, 407 (1992). This is fatal to the

18   theory.

19        Fourth, Plaintiffs argue that the contractual limitations was tolled by virtue of fraudulent

20   concealment. But Plaintiffs offer no evidence that any of the named plaintiffs was unaware of

21   their claim against State Farm or that the deductions were concealed. There is no basis to support

22   this theory. And by failing to plead it, Plaintiffs waived the request for equitable tolling. See

23   Wasco Prods., Inc. v. Southwall Techs., Inc., 435 F.3d 989, 991 (9th Cir. 2006).

24

The Court finds that State Farm is entitled to enforce the contractual limitation, and that any Classes' breach of contract claims may only extend back one year before filing of the respective lawsuits.

### 2.     CPA Statute of Limitations

The Parties agree that a four-year statute of limitations applies to Plaintiffs' CPA claims. (See Mot. at 16; Pl. Opp. at 12.) Thus, the Class's CPA claims reach only back to March 25, 2016. Plaintiffs assert they "have applied that limit in their showing of damages, without consideration of the discovery rule." (Pl. Opp. at 12.) Based on the Court's review, Torelli did, indeed, run the CPA damages calculation from March 25, 2016. (Torelli Decl. ¶ 14.) As such, this limitation has been factored into the Court's damages award.

### 3.     Bad Faith Statute of Limitations

State Farm has moved to limit the time period of the proposed Jama Class's bad faith claims to three years before filing—March 10, 2017. (Dkt. No. 185 at 17.)

"Under Washington law, a cause of action for insurance bad faith has a three-year statute of limitations." Berkshire Hathaway Homestate Ins. Co. v. SQI, Inc., 132 F. Supp. 3d 1275, 1298 (W.D. Wash. 2015) (citations omitted); Dees v. Allstate Ins. Co., 933 F. Supp. 2d 1299, 1306 (W.D. Wash. 2013). Here, the three-year statute of limitations runs from the date of filing (March 10, 2020) making the Jama Class's bad faith claims reach back only to March 10, 2017. Plaintiffs fail to provide a specific response to this request. Instead, they appear to rely on their tolling, equitable estoppel, and waiver arguments as outlined above in the context of the breach of contract limitations. The Court's rejection of these arguments apply equally to Plaintiffs' bad faith claim. Accordingly, the Court GRANTS the Motion as to this issue and limits the bad faith claims to March 10, 2017.

**CONCLUSION**

As to Plaintiffs' Motion for Summary Judgment, the Court finds that Plaintiffs are entitled to summary judgment on their CPA claims, given the unrebutted evidence that State Farm violated the CPA and that the named Plaintiffs and Classes have suffered cognizable injuries. The Court finds that the proper measure of damages is the amount taken by State Farm as a negotiation deduction. Plaintiffs have provided uncontested evidence showing that the Classes suffered $54,650,595.28 in damages ($48,520,015.61 for the Kelley class and $6,130,579.67 for the Jama class). As to Ngethpharat, the Court finds that she was injured in the amount of $385.77, and she is entitled to this amount as damages. But the Court rejects Plaintiffs' request for classwide prejudgment interest, and notes that they have not sought prejudgment interest for the named Plaintiffs. Lastly, the jury must determine the request for enhanced damages, not the Court. Given these determinations, the Court GRANTS in part and DENIES in part Plaintiffs' Motion as to the CPA claims, and DENIES AS MOOT State Farm's Motion to Exclude the Owens Declaration. The Court further DENIES Plaintiffs' Motion as to the breach of contract claim.

The Court GRANTS State Farm's Motion for Summary Judgment as to the statute of limitations. The Parties agree that the CPA claims are subject to a four-year statute of limitations. And the Court agrees with State Farm that Plaintiffs' breach of contract are limited by a one-year statute of limitations and the bad faith claims are subject to a three-year statute of limitations.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 29, 2025.

Marsha J. Pechman
United States Senior District Judge