UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ANYSA NGETHPHARAT, et al.,<br><br>Plaintiff(s),<br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>Defendant(s). | CASE NO. C20-0454-KKE<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL |
| FAYSAL A. JAMA,<br><br>Plaintiff(s),<br>v.<br><br>STATE FARM FIRE AND CASUALTY COMPANY,<br><br>Defendant(s). | |

This matter comes before the Court following a four-day bench trial that took place during the week of April 6, 2026. Following the Court's Order on Scope of Trial, Dkt. No. 321, the sole issue the trial addressed was whether Plaintiffs are entitled to enhanced damages under the Washington Consumer Protection Act ("CPA"). *See* Wash. Rev. Code § 19.86.090. For the reasons below, the Court finds that Plaintiffs have failed to meet their burden of proving entitlement to enhanced damages in any amount.

# I. BACKGROUND

This case has a long and complex procedural history. Although the Court has recounted that procedural history in prior orders, *see, e.g.*, Dkt. No. 272, for the sake of completeness the Court summarizes that history again here. This summary is for background purposes only. The Court's findings of fact and conclusions of law follow.

## A. State Farm Uses Autosource in Washington to Estimate "Actual Cash Value."

Defendants (individually, "State Farm Mutual" and "State Farm Fire"; collectively, "State Farm") offer car insurance in Washington and throughout the United States. When a covered vehicle is totaled, State Farm must pay the policyholder its "actual cash value" under the insurance policy. During the relevant period—March 2016 through September 2021—State Farm used vehicle valuation software called Autosource, developed by third-party Audatex, to help claims handlers estimate actual cash value and pay total loss claims. Although the methodology is detailed below, as a general matter Autosource searches its database of vehicle advertisements that are comparable to the totaled vehicle. It adjusts the advertised price of the comparable vehicle for "typical negotiation" and then makes a series of further adjustments for options, mileage, and condition, to arrive at an actual cash value for the totaled vehicle. The process results in an "Autosource report" provided to State Farm. Once State Farm receives the report for a particular totaled vehicle, generally a claims handler contacts the policyholder to discuss the valuation and, if possible, reach an agreement as to the amount. If State Farm and the policyholder cannot agree on an actual cash value amount, then there is an "escalation" process where State Farm could obtain an actual cash value based on a different methodology, such as "dealer quotes," or either party could invoke the appraisal mechanism in the policy.

**B. Plaintiffs Sue State Farm for Violating Wash. Admin. Code § 284-30-391.**

After accidents, each Plaintiff—James Kelley, Anysa Ngethpharat, and Faysal Jama—made an insurance claim with State Farm, which declared the vehicles total losses. State Farm then used Autosource to estimate the actual cash value of the totaled vehicles, and it paid Mr. Kelley and Mr. Jama the resulting values. Ms. Ngethpharat objected to her car's valuation, so State Farm paid her based on dealer quotes, which values the vehicle based on the opinions from two local used car dealers about what amount the car would likely sell for.

Plaintiffs brought two separate putative class actions against State Farm, challenging the typical negotiation and condition adjustments as unlawful under Wash. Admin. Code § 284-30-391 ("§ 391"). In the case brought against State Farm Mutual, Plaintiffs sued for breach of contract and violation of the CPA. In the case brought against State Farm Fire, Plaintiff claimed breach of contract, bad faith, and breach of the covenant of good faith and fair dealing. In both cases, however, Plaintiffs premised all of their claims on the same theory: namely, that the typical negotiation adjustment violated Wash. Admin. Code § 391, and that the alleged regulatory violation supported claims for breach of contract, violation of the CPA, and bad faith. In the case against State Farm Fire, Plaintiff also challenged State Farm's condition adjustment as violating Wash. Admin. Code § 391, although Plaintiff later abandoned that theory. All Plaintiffs sought to recover the exact amount of the allegedly unlawful typical negotiation adjustment plus sales tax and prejudgment interest.

Plaintiffs claimed they could prove the fact and extent of injury by focusing on the adjustments they claimed were unlawful—in other words, by arguing that State Farm would automatically be liable for any prohibited deductions, regardless of the fair market value of their cars and the actual amount they were paid. Put another way, in Plaintiffs' view, what each

policyholder should have been paid could be determined by backing out allegedly non-compliant adjustments from what they were paid by State Farm.

**C. The Court Denies State Farm's Motion to Dismiss or Compel Appraisal.**

State Farm moved to dismiss Plaintiffs' claims or, in the alternative, to compel appraisal under the insurance policies. Dkt. No. 16. State Farm argued that Plaintiffs had failed to plausibly allege an underpayment of "actual cash value," defined in Washington to mean "fair market value," Wash. Admin. Code § 284-30-320(1), which is the price "an informed buyer would willingly pay and an informed seller would accept," *DePhelps v. Safeco Ins. Co. of Am.*, 65 P.3d 1234, 1240 (Wash. Ct. App. 2003). Dkt. No. 16 at 5–6. State Farm also argued that Wash. Admin. Code § 391(4)(b) does not prohibit typical negotiation adjustments. Dkt. No. 16 at 7–8. That subsection requires insurers to "[b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently available, or were available within ninety days of the date of loss, using appropriate deductions or additions for options, mileage or condition when determining comparability." Wash. Admin. Code 284-30-391(4)(b). State Farm argued that § 391(4)(b)'s list of three permissible deductions (options, mileage, and condition) does not exclude *other* permissible deductions and, in any event, only describes permissible deductions taken to "determin[e] comparability" between the actual cash value of a comparable vehicle and a loss vehicle. *Id.* at 8. It does not, State Farm argued, limit the adjustments an insurer may make to an *advertised* price to determine a comparable vehicle's actual cash value. *Id.* In the alternative, State Farm moved to compel appraisal. *Id.* at 11–13. In an Order dated November 9, 2020, the Court denied both motions.[1] Dkt. No. 49.

[1] This case was originally assigned to the Honorable Marsha J. Pechman, who presided over the matter until it was reassigned to the undersigned on October 17, 2025. Dkt. No. 300.

**D. The Court Initially Grants Class Certification.**

The Court initially certified two classes of State Farm policyholders who received total-loss payments: the *Kelley* class, which concerned the typical negotiation adjustment, Dkt. No. 136 at 27, and the *Jama* class, which concerned both the typical negotiation and condition adjustments, *Jama*, No. 20-cv-652-MJP, Dkt. No. 109 at 30. In certifying these classes, the Court rejected State Farm's argument that the actual cash value for each class member's vehicle would need to be individually determined, thus precluding commonality and predominance under Rule 23. Dkt. No. 136 at 15. Instead, it agreed with Plaintiffs that, because they "challenge[d] only the legality of the deduction[,]" they needed to prove only "the amount of the [deduction] that was taken." Dkt. No. 136 at 15.

The Court also rejected State Farm's argument that Wash. Admin. Code § 391 permitted State Farm and the insured to reach any "agreed value" regardless of the methodology employed, provided that agreement was documented in the claim file. *See* Dkt. No. 136 at 12–15. The Court instead interpreted Wash. Admin. Code § 391's "agreed value" provision to apply only where "the insured expressly agreed to the typical negotiation discount" and that agreement was "documented in the claim file." *Id.* at 12–14.

**E. The Ninth Circuit Decides *Lara v. First National Insurance Co. of America*.**

After the Court granted class certification, the Ninth Circuit decided *Lara v. First National Insurance Co. of Am.*, 25 F.4th 1134 (9th Cir. 2022), which addressed "how auto insurance companies value totaled vehicles." *Id.* at 1136. The plaintiffs in *Lara* challenged a deduction to account for the difference in condition between the average car owned by a private person and used cars for sale at dealerships. *Id.* at 1136–37. They claimed that those condition adjustments violated Wash. Admin. Code § 391 because they were not "itemized," "verifiable," or detailed in

the way the regulations required. *Id.* at 1137. That violation, the plaintiffs alleged, breached Liberty Mutual's insurance contracts and violated the CPA. *See id.* at 1136.

The Ninth Circuit held that the plaintiffs needed to prove the actual cash value of their cars to prove injury under their breach of contract and consumer protection claims and that "if a putative class member was given that amount or more, then he or she cannot win on the merits." *Id.* at 1139. But because "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person," the Ninth Circuit concluded that "common questions [did] not predominate." *Id.*

### F. Applying *Lara*, the Court Decertifies the Classes and Grants Summary Judgment for State Farm.

State Farm moved to decertify the classes based on *Lara* and also invoked that ruling to support its pending motion for summary judgment. The Court granted both motions, reasoning that "*Lara* makes clear that Plaintiffs have not provided sufficient evidence of injury to sustain their claims and that they lack standing." Dkt. No. 219 at 3. Specifically, the Court found that *Lara* required Plaintiffs to "demonstrate that they received less than the [actual cash value]" of their vehicles and rejected "the theory that the plaintiff may show injury merely by proving that the insurer failed to follow Washington's regulatory process." *Id.* at 5. *Lara* thus "compel[led] entry of summary judgment in State Farm's favor on Plaintiffs' individual claims" because, the Court explained, Plaintiffs "ha[d] not identified any evidence that they received less than [actual cash value]." *Id.* at 6. And because Plaintiffs had not established standing to represent a class, the Court vacated its prior certification order. *Id.* at 9–10.

**G. The Ninth Circuit Reinstates Certification for the Typical Negotiation Class and Reverses Summary Judgment.**

On appeal, in *Jama v. State Farm Mutual Automobile Ins. Co.*, 113 F.4th 924 (9th Cir. 2024), the Ninth Circuit assessed whether Plaintiffs could maintain a class action based on a theory of liability that the typical negotiation adjustment was "*always* unlawful, regardless of the amount," because it violated Wash. Admin. Code § 391. *Id.* at 934. The panel majority held that, because Plaintiffs' theory of liability was that the negotiation adjustment was always illegal under Washington law, class members could measure their injuries on a class-wide basis based on "the exact amount of the impermissible negotiation deduction." *Id.* at 933. Accordingly, the majority held that this Court's decertification order had been premised on a misinterpretation of *Lara*. The majority affirmed decertification as to the condition adjustment class, however. *Id.* at 935–36.

The majority also reversed summary judgment, concluding that *Lara* "did not purport to address the actual evidence any individual Plaintiff must adduce to give rise to a genuine dispute of material fact." *Id.* at 936. Rather, because *Lara* was a Rule 23 decision, not a summary judgment decision, it could not be read to establish substantive injury standards under Washington law. *Id.* at 936–37, 938 n.11. *Jama* therefore held that *Lara* did not require Plaintiffs to undertake a separate valuation process or introduce evidence of value independent of the Autosource reports themselves. *Id.* In other words, *Lara* did not preclude Plaintiffs from relying on the difference between an insurer's valuation calculation and the amount of the challenged adjustment as "relevant evidence of injury." *Id.* at 937 n.10.

Finally, the Ninth Circuit held that Plaintiffs' case did not implicate Article III concerns because "Plaintiffs' claim is that they were paid less than they were owed under their insurance policies with State Farm." *Id.* at 937. This, the Ninth Circuit found, was a "classic pocketbook injury" in the form of a "lighter wallet" that was sufficient to confer Article III standing. *Id.*

Given this reasoning, the Ninth Circuit remanded with instructions to consider whether Plaintiffs had presented "sufficient evidence of injury to survive summary judgment." *Id.* at 930.

**H. The Court Grants Summary Judgment in Plaintiffs' Favor on the CPA Claim.**

On remand, State Farm renewed its motion to compel appraisal because Plaintiffs had changed their theory of liability on appeal, turning the case into a valuation dispute rather than one over methodology. Dkt. No. 251. State Farm also sought leave to reopen the pretrial expert disclosure deadline to permit State Farm to prepare an expert valuation of each Plaintiff's totaled vehicle. Dkt. No. 250. The Court denied both motions. Dkt. No. 266.

Following supplemental briefing addressing unresolved issues in the parties' cross-motions for summary judgment, *see* Dkt. Nos. 258, 259, 260, 261, the Court granted summary judgment in Plaintiffs' favor on liability under the CPA and for actual damages for the typical negotiation class. Plaintiffs abandoned any claim premised on the condition adjustment, which the Court then dismissed. *See* Dkt. No. 272 at 12. The Court found that State Farm's use of typical negotiation adjustments, as part of the Autosource reports prepared by third-party Audatex, violated Wash. Admin. Code § 391 and that this regulatory violation was a "per se" violation of the CPA. Dkt. No. 272 at 13–15. After rejecting State Farm's remaining arguments that disputed issues of fact remained, the Court awarded the *Kelley* and *Jama* classes actual damages of $33,979,240.07 and $4,320,899.29, respectively. Dkt. No. 272; Dkt. No. 276. The Court also granted summary judgment in Plaintiff Ngethpharat's favor on her individual CPA claim for $385.77. Dkt. No. 272 at 24–25.

The Court, however, denied Plaintiffs' motion for summary judgment on their contract claims—which were premised solely on a violation of Wash. Admin. Code § 391—finding there was "no merit to Plaintiffs' position that all insurance regulations are incorporated into the insuring agreements." Dkt. No. 272 at 34. The Court also found that State Farm's contractual one-year

suit limitation provision barred most Plaintiffs' contract claims (to the extent that they would survive at all), rejecting Plaintiffs' various arguments in opposition, including the argument that their contract claims arose under the inapplicable Uninsured Motor Vehicle Property Damage coverage. Dkt. No. 272 at 35–36. Finally, the Court rejected Plaintiffs' request for prejudgment interest, finding Plaintiffs had failed to establish that damages were liquidated. Dkt. No. 272 at 22–23. The Court found that Plaintiffs' classwide damages were unliquidated because Plaintiffs' expert, Dr. Paul Torelli, calculated prejudgment interest based on an "average negotiation deduction" derived from a sample of claim files—calculations that were "not based on the amount of negotiation deduction taken on each Autosource Report." Dkt. No. 272 at 22–23. Plaintiffs moved to reconsider these rulings, which the Court denied. Dkt. No. 280 at 2–5.

## I. This Court Addresses the Scope of Trial, the Parties' Motions in Limine, and Additional Pretrial Issues.

After this case was reassigned to the undersigned, Dkt. No. 300, the Court addressed several outstanding issues relating to trial scope, motions in limine, and other pretrial and evidentiary matters.

First, in its Order on Trial Scope, the Court declined Plaintiffs' request to revisit Judge Pechman's earlier rulings that Plaintiffs could not state claims for breach of contract premised on a violation of Wash. Admin. Code § 391, that the one-year suit limitation provision barred most of Plaintiffs' contract claims, and that Plaintiffs were not entitled to prejudgment interest on classwide damages related to the negotiation deduction. Dkt. No. 321 at 4–11. The Court reaffirmed the prior rulings and found that Plaintiffs had failed to present a justification for reconsidering them. Dkt. No. 321 at 7, 10. Accordingly, the Court also formally dismissed Plaintiffs' breach of contract claims. Dkt. No. 321 at 7.

Second, this Court denied Plaintiffs' request to reopen discovery to individually calculate each class member's damages for the purpose of trying to establish liquidated damages and prejudgment interest. Dkt. No. 321 at 11.

Third, this Court denied Plaintiffs' request to exclude the testimony of Diane Klund,[2] Audatex's Director of Regulatory and Government Affairs, finding that any alleged nondisclosure of Ms. Klund did not prejudice Plaintiffs.

Finally, the Court largely denied the parties' contested motions in limine, in part due to the parties' agreement to proceed to a bench trial, Dkt. No. 315, deferring such determinations until trial. Dkt. No. 321 at 13–23.

In the month leading up to trial, Plaintiffs sought to take a preservation deposition of Dr. Torelli to develop testimony relating to prejudgment interest calculations for individuals identified in the claim files sample. Dkt. No. 322 at 3–4. State Farm objected to Plaintiffs' request. *Id.* at 2–3. And the Court denied Plaintiffs' request, finding that its prior rulings disallowing prejudgment interest rendered the proposed testimony irrelevant. Dkt. No. 328 at 2–4.

**J. The Parties Proceed to a Bench Trial on the Issue of CPA Enhanced Damages.**

In light of the Court's Order on Trial Scope, and because Plaintiffs dismissed their outstanding bad faith claim at the pretrial conference, Pretrial Hr'g Tr., Feb. 3, 2026 (Dkt. No. 344), 49:3–9, the parties proceeded to a bench trial solely on the issue of enhanced damages under the CPA.

At trial, Plaintiffs' case-in-chief consisted of the in-court testimony from two expert witnesses: Darrell Harber and Mary Owen. Plaintiffs presented Mr. Harber as an expert in vehicle appraisal practices and Ms. Owen as an expert in insurance standards and practices. At Plaintiffs'

[2] The Court refers to Ms. Klund by her former last name for sake of consistency, *see* Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 654:13-17.

request (which was omitted from the parties' joint pretrial statement), Plaintiffs also were permitted provisionally to question Doug Graff, State Farm's corporate representative, in their case-in-chief.[3] Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 445:5–12. Plaintiffs also offered deposition designations, including: the December 4, 2020 Rule 30(b)(6) deposition of State Farm (presented through its designee, Mr. Graff); the April 15, 2021 deposition of Mr. Graff (taken in his personal capacity); the January 14, 2021 Rule 30(b)(6) deposition of Audatex (presented through its designee, Neal Lowell); the April 20, 2021 deposition of Mr. Lowell (taken in his personal capacity); the January 15, 2021 deposition of Ellie Gray, a State Farm claims handler; the August 6, 2021 deposition of Laurie Burke, an appraiser with third-party Big Block Appraisal Service; and the August 6, 2021 deposition of Mark Olson, an appraiser with third-party Future Forensics. At the close of evidence, State Farm orally moved to strike the deposition designation of Mr. Graff in his personal capacity[4] and the deposition of Mr. Lowell because the witnesses were available to testify. State Farm also moved to strike the designations from the Rule 30(b)(6) deposition of Audatex because Audatex was not a party-opponent. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 727:21–728:5, 733:21–734:2. As addressed in the Court's Order on Motion to Strike Deposition Designations, the Court found Mr. Graff's personal deposition admissible but granted State Farm's motion to strike the deposition designations of Mr. Lowell and Audatex. Dkt. No. 370 at 2–3. Accordingly, the Court will consider the admitted deposition designations to the extent that the Court finds the testimony relevant.

---

[3] The Court permitted Plaintiffs' counsel to examine Mr. Graff in its case-in-chief provisionally but stated that State Farm could move to strike the testimony. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 445:5–12. State Farm has not moved to strike Mr. Graff's testimony. Accordingly, the Court admits Mr. Graff's testimony.

[4] State Farm later clarified that it had no objection to the Court considering Mr. Graff's deposition. Dkt. No. 361 at 3.

Plaintiffs also requested that the Court take judicial notice of four documents—an unopposed motion for preliminary approval of a class action settlement in another case involving State Farm, a tax form submitted by State Farm, a State Farm press release, and a district court's findings of fact and conclusions of law approving a class action settlement in another case involving State Farm. Dkt. No. 334. The Court granted Plaintiffs' request for judicial notice for the purposes of establishing the existence and contents of the documents, but not for the truth of any matters stated therein. *Id.* at 7–9.

State Farm's case-in-chief consisted of the in-court testimony of three fact witnesses: Mr. Graff, Mr. Lowell, and Ms. Klund. State Farm also requested that the Court take judicial notice of *Zuern v. IDS Property Casualty Ins. Co.*, No. C19-6235-MLP, 2020 WL 2114502 (W.D. Wash. May 4, 2020), for the fact of the decision, a request the Court granted. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 726:23–727:8.

Plaintiffs did not present rebuttal witnesses or evidence. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 727:12–13.

The Court also addressed another issue that arose during trial that merits discussion here. During trial preparations with Ms. Klund, State Farm belatedly uncovered and disclosed three emails between Ms. Klund and insurance company customers regarding consumer complaints to the Washington Office of the Insurance Commissioner ("Washington OIC") about the typical negotiation adjustment. Two of those emails involved State Farm: a 2017 email involving a State Farm claims handler, and a 2020 email involving Mr. Graff. Based on this disclosure, Plaintiffs renewed their motion to exclude Ms. Klund because State Farm had failed to disclose these documents during discovery. Dkt. No. 336. State Farm opposed that motion but disclaimed any intention to use the 2020 email at trial, unless Plaintiffs opened the door to that evidence. Dkt.

No. 343. For the reasons stated on the record and in a subsequent written Order, the Court denied Plaintiffs' renewed motion. Dkt. No. 353 at 2–6.

At the close of Plaintiffs' case-in-chief, State Farm moved for judgment on partial findings under Rule 52. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 458:6–459:7; *see also* Dkt. No. 347. Plaintiffs filed a written response. Dkt. No. 355. In a bench trial, a motion for judgment on partial findings is akin to a motion for a directed verdict. Fed. R. Civ. P. 52(c). Under Rule 52(c), "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). "The court may, however, decline to render any judgment until the close of the evidence." Fed. R. Civ. P. 52(c). For the reasons stated on the record, the Court declined to render judgment until after the close of evidence, consistent with Rule 52(c), and therefore denied State Farm's motion. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 459:12–16. However, the Court has reviewed and considered the parties' briefing on these issues in rendering its findings and conclusions. *See id.*

## II. LEGAL STANDARD

Under the CPA, "the court may, in its discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained." Wash. Rev. Code § 19.86.090.

To be entitled to enhanced damages under the CPA, the Court considers whether such damages are necessary to (1) fully compensate the injured consumer; (2) encourage private citizens to bring Washington CPA claims that benefit the public; (3) deter unlawful conduct; and (4) punish unlawful conduct. *Sing v. John L. Scott, Inc.*, 920 P.2d 589, 598 (Wash. Ct. App. 1996), *rev'd on other grounds*, 948 P.2d 816 (Wash. 1997); *Innovative Sols. Int'l, Inc. v. Houlihan Trading Co.*, No. C22-0296-JCC, 2025 WL 949579, at *1–2 (W.D. Wash. Mar. 27, 2025); *Ten*

*Bridges, LLC v. Midas Mulligan, LLC*, No. C19-1237JLR, 2021 WL 4592385, at *6 (W.D. Wash. Oct. 6, 2021), *aff'd*, No. 21-35896, 2022 WL 17039001 (9th Cir. Nov. 17, 2022). The parties agree that Plaintiffs have the burden to establish their entitlement to enhanced damages by a preponderance of the evidence. Dkt. No. 295 at 49–50; Dkt. No. 298 at 77; *see also Larsen v. PTT, LLC*, No. 18-cv-05275 TMC, Dkt. No. 601 (W.D. Wash. Feb 6, 2025). In the context of a bench trial, the decision whether to award enhanced damages under the CPA is discretionary with the Court. *Innovative Sols. Int'l*, 2025 WL 949579, at *1; *Ten Bridges, LLC*, 2021 WL 4592385, at *6.[5]

With the legal standard articulated, the Court proceeds to its findings of fact and conclusions of law.

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

For the reasons below, the Court finds that Plaintiffs have failed to meet their burden to establish that enhanced damages are necessary to adequately compensate Plaintiffs or the class, encourage private citizens to bring lawsuits benefiting the public, deter State Farm from engaging in similar conduct, or punish State Farm. Accordingly, the Court holds that Plaintiffs are not entitled to enhanced damages in any amount.

### A. Plaintiffs' Case-In-Chief

The Court begins by summarizing the evidence presented in Plaintiffs' case-in-chief. Plaintiffs presented the testimony of two experts, Mr. Harber and Ms. Owen, and examined State Farm's corporate representative, Mr. Graff.

[5] Because the Court finds that Plaintiffs have not established their entitlement to enhanced damages under the ordinary four-factors test just described, the Court does not reach State Farm's alternative argument that Plaintiffs must also establish conduct that is sufficiently "reprehensible" to pass constitutional muster. Dkt. No. 355 at 4–5. Nor does it reach State Farm's argument that state law recognizes an affirmative defense to enhanced damages if State Farm proves by a preponderance of the evidence that it had a good faith and reasonable belief that its conduct did not violate the law. *See* Dkt. No. 296 at 9 (citing *Young v. Whidbey Island Bd. of Realtors*, 638 P.2d 1235, 1240 (Wash. 1982)).

1. Darrell Harber

Mr. Harber is a licensed public adjuster, vehicle appraiser, former used car dealer, and former collision repair shop owner. Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 79:16–80:6. For about the past 15 years, however, Mr. Harber mostly has been assisting consumers with insurance claims, largely in the automotive context, through his business, Harber Appraisal. *Id.* at 80:2–14. In that role, Mr. Harber may act both as a public adjuster (where he represents the insured and may settle the claim on the insured's behalf), or a vehicle appraiser (where he estimates the actual cash value of an insured's totaled vehicle under an insurance policy's appraisal clause). *Id.* at 81:11–24.

On direct examination, Mr. Harber testified that he has represented insureds in total loss claims with State Farm "at least" 400 to 500 times, an estimate he gave based on his understanding of State Farm's market share in Washington. Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 86:6–17. Mr. Harber testified that insureds in total loss situations are often "frustrated" and "pressured" into settling total loss claims on a "take it or leave it" basis. *Id.* 94:2–95:3. He further testified that insureds often feel this frustration or pressure because their rental car coverage generally expires after three days, so they don't have time to obtain a replacement vehicle. *Id.* at 97:11–22.

Mr. Harber also testified on direct examination that he found the typical negotiation adjustment objectionable and inadequately disclosed, that State Farm would not remove the adjustment when asked to do so, and that State Farm claims handlers did not understand the Autosource methodology in sufficient detail to explain the adjustment to policyholders. Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 101:10–19, 105:1–106:16, 111:24–112:16. Mr. Harber also testified generally about State Farm's duty of good faith and fair dealing, State Farm's obligations to its insureds, and that, from the materials he had reviewed, State Farm had conducted no investigation into the propriety of the typical negotiation adjustment before or while using Autosource. The Court sustained several objections to Mr. Harber testifying to legal conclusions, Mr. Harber

testifying to hearsay communications, and Plaintiffs' counsel offering unsworn testimony to which Mr. Harber would then agree. *See, e.g.*, *id.* at 96:11–19, 98:2–13, 152:21–153:11.

On cross-examination, Mr. Harber testified that the "intent" of the typical negotiation adjustment was to predict the "fair market value" of a vehicle (i.e., the price at which a car would sell between a willing buyer and willing seller in an arm's length transaction), Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 206:5–8, 206:22–207:2, 208:4–8, that most people negotiate the price of used cars, *id.* at 217:4–19, and that the concept of "fair market value" is irrelevant to determining actual cash value in Washington, *id.* at 220:2–11. He also testified that it was irrelevant to him whether the Washington OIC does not believe the typical negotiation adjustment violates Wash. Admin. Code § 391 because he could "read the rules, and the rules don't allow for it." Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 170:4–171:4.

Mr. Harber also testified that, in his view, the statistical vehicle valuation methodologies used by Audatex's primary competitors, CCC and Mitchell, also violate Washington's insurance regulations. Trial Tr. Apr. 7, 2026 (Dkt. No. 357), 222:23–223:22. Mr. Harber testified that he was unaware of the Washington OIC having ever investigated these vehicle valuation vendors or methodologies for violating Wash. Admin. Code § 391, stating that he understood the agency was understaffed and overworked. *Id.* at 223:23–226:21. Finally, he testified that he had never advised a consumer to lodge a complaint with the Washington OIC about the typical negotiation adjustment, and had never, in his role as a public adjuster, lodged such a complaint on a client's behalf. *Id.* at 223:23–226:21, 259:3–14.

2. <u>Mary Owen</u>

Ms. Owen is an attorney and was offered as an expert in insurance standards and practices based on her years of experience defending insurance companies in private practice and, most extensively, managing GEICO's staff counsel office in Washington for 18 years. Trial Tr., Apr.

7, 2026 (Dkt. No. 357), 261:1–20. As for Ms. Owen's relevant experience, she testified that she would "advise the claims departments and give tutorials" to explain "the importance of compliance with regulations governing their conduct in handling claims." *Id.* 261:11–20. Ms. Owen further testified she "taught claims examiners on how to comply with the jurisdictional requirements," acted as a "resource for the claims department when there was any confusion as to whether or not a practice was in compliance," and advised the claims department regarding "any new mandates or regulations." *Id.* at 261:11–20.

Based on that background, and her review of documents and depositions in this case, Ms. Owen testified that State Farm did not perform any internal "compliance analysis" regarding the typical negotiation adjustment, did not sufficiently understand how the Autosource valuation methodology worked, and failed to disclose the typical negotiation adjustment to insureds, a practice she criticized as "systemic." Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 265:4–10. Ms. Owen also testified that State Farm failed to comply with industry standards when it did not stop applying negotiation adjustments after this Court's Order, entered November 9, 2020, denying State Farm's motion to dismiss. *Id.* at 310:1–16. And finally, Ms. Owen testified that insurance companies generally invest unpaid premiums, called "float," to manage their overall financial operation. *Id.* at 315:25–316:23.

On cross–examination, Ms. Owen testified that the bulk of her relevant experience involved defending insureds, on behalf of GEICO, in automobile accident cases, and that she had not defended GEICO in extracontractual or CPA claims, though she had advised on such matters. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 322:18–324:8. Ms. Owen also consistently refused to answer questions about the purported basis for her expertise and opinions—her role as manager of

GEICO's staff counsel office—on privilege and confidentiality grounds. *Id.* at 327:24–328:15, 347:12–21, 348:3–16, 349:3–10; 350:24–351:4, 352:6–15, 353:5–12.[6]

Ms. Owen testified that she could not recall providing any advice to the GEICO claims department regarding compliance with Wash. Admin. Code § 391, the use of vehicle valuation software, or total losses more generally. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 333:20–336:1, 353:13–355:3, 356:1–360:11. Ms. Owen specifically testified that her role at GEICO "was not giving compliance advice, that I recall, regarding 391." *Id.* at 360:19–20.

Finally, although on direct examination Ms. Owen stated that her opinions reflected industry "standards and practices," when asked to identify the specific relevant standards and practices on cross-examination, Ms. Owen could identify only the Washington Administrative Code. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 362:10–24, 367:2–369:21. The Court's in limine order prohibited Plaintiffs' experts from offering legal opinions, and Ms. Owen did not offer any factual basis for her opinion. Dkt. No. 321 at 19–20.

3. <u>Doug Graff</u>

Plaintiffs also briefly examined State Farm's Corporate Representative, Mr. Doug Graff, as an adverse witness. Mr. Graff testified that his deposition testimony as a Rule 30(b)(6) designee was truthful and accurate, except that he would supplement it to add the existence of the belatedly disclosed emails about the Washington OIC complaints. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 446:2–5. Mr. Graff also testified that he at all pertinent times had a "functional[]" but not "forensic" understanding of the Autosource methodology and the typical negotiation adjustment. *Id.* at 447:21–25. And he answered some general questions about Audatex marketing and training

[6] Although the Court is sensitive to issues of privilege and confidentiality, an expert witness cannot simultaneously claim expertise on a topic and then refuse to answer questions designed to explore the basis for that expertise, particularly when the questions were unlikely to touch on genuinely privileged or confidential information and were inextricably linked with the anticipated affirmative testimony. As discussed below, given Ms. Owen's incomplete responses, the Court concludes that her opinions are worth substantially less weight.

materials. *Id.* at 450:13–452:14. Finally, Mr. Graff answered questions about how State Farm accounts for the conditioning and maintenance of a total loss vehicle when generating a valuation. *Id.* at 455:17–457:3.

4. Other Evidence

Plaintiffs also submitted deposition designations of State Farm, Mr. Graff, Ms. Gray, Ms. Burke, and Mr. Olson, and the four documents referenced above in conjunction with a request for judicial notice.

**B. State Farm's Case-In-Chief**

The Court next summarizes the evidence presented in State Farm's case-in-chief. State Farm presented the testimony of three fact witnesses: Mr. Graff, Mr. Lowell, and Ms. Klund.

1. Doug Graff

Mr. Graff testified that he has been an employee of State Farm for 31 years and has held many roles, including as a claims handler, but has primarily worked in various management positions. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 460:15–462:1. From 2011 to 2020, Mr. Graff was a claims consultant who, at least between 2015 and 2020, had oversight responsibility over State Farm's total loss segment. *Id.* at 476:12–23, 479:23–480:1. In that role, Mr. Graff provided oversight and consulting guidance to the total loss claims handling teams on State Farm processes, procedures, and policies. *Id.* at 476:16–23. He was also responsible for interacting with Audatex on issues relating to processes, procedures, training, and compliance between 2016 and 2021, during which time Audatex was State Farm's valuation and estimating vendor. *Id.* at 476:24–477:10. Mr. Graff also served as State Farm's Rule 30(b)(6) designee, and he was State Farm's corporate representative at trial.

In broad terms, Mr. Graff's testimony can be organized into three general categories: (a) State Farm's claims handling process generally, (b) State Farm's relationship with Audatex,

including Audatex's representations to State Farm related to state law compliance, and (c) State Farm's understanding of the Autosource methodology, including any attempts made by State Farm to independently analyze it, and State Farm's eventual transition to using a different methodology.

a. *State Farm's Claims Handling Process*

During the class period, State Farm used Autosource as its "primary valuation and estimating vendor" to provide market valuation research in the form of Autosource reports for most of its total loss claims. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 477:6–8. According to Mr. Graff, at least 90% of insurers use vehicle valuation software such as Autosource to assist in valuing total loss claims, among other services. *Id.* at 482:6–483:22.

Mr. Graff described the valuation process at a general level: He stated that the process begins when a State Farm customer calls State Farm to inform State Farm of a vehicle accident or other circumstance. If the vehicle was available for inspection, a State Farm employee would inspect the vehicle, gather details about it (such as vehicle year, make, model, and mileage), and rate the vehicle's pre-loss condition. The State Farm employee would then upload that information into the Autosource system, which would trigger the valuation process, ultimately resulting in an Autosource report containing an actual cash value. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 484:21–486:10, 497:11–500:25. According to Mr. Graff, he considered Autosource reports to be State Farm's market research into the actual cash value (or fair market value) of the totaled car. *Id.* at 485:16–24.

A claims handler would then call the State Farm customer and discuss the valuation. According to Mr. Graff, and in his experience, most customers have done their own research into vehicle value, and most customers have a number in mind before discussing vehicle value with the claims handler. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 525:21–526:4. In Mr. Graff's experience, about 70% of the time, State Farm and its insureds would reach an agreement on the value of the

vehicle with only "one valuation in the file"—i.e., the first value offered. *Id.* at 507:5–508:12. That "agreed" value is then recorded in the claim file. *Id.* at 508:13–17, 509:3–510:3; *see also* Trial Ex. 2. On cross-examination, Plaintiffs' counsel elicited that, in one instance referred to on direct, the agreed value of the total loss vehicle was about $500 less than the advertised price of the insured's replacement vehicle, according to the claims file. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 580:8-583:5. 583:14-584:13.

After an agreement is reached, the total loss settlement paperwork is prepared and sent to the customer. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 510:4–15. That paperwork includes a total loss settlement letter that informs the customer of the "actual cash value" amount and invites the customer to contact State Farm if he or she has more information to consider when determining value. *Id.* at 517:13–17, 518:1–519:10; *see also* Trial Ex. 7. The paperwork also includes a power of attorney that must be signed to transfer title to State Farm. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 520:3–14. Once the paperwork is signed, then State Farm issues payment. *Id.* at 511:24–512:12. Mr. Graff likened this process to State Farm buying the customer's totaled car. *Id.* at 512:2–6.

Mr. Graff testified that, if the customer disagreed with the valuation, a claims handler could escalate the claim and settle it using different comparables or another valuation methodology, such as appraisal. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 511:4–17. The details of these customer interactions are recorded in State Farm's claim files, which summarize the communications between the claims handlers and the customer and indicate the various claims handling steps. *Id.* at 512:13–514:13; *see also* Trial Exs. 511, 512, 513, 514, 515. Mr. Graff testified that, during this process, State Farm claims handlers are allowed to share any valuation information with a customer. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 521:12–24.

According to Mr. Graff, State Farm claims handlers receive general training in claims handling and compliance and have access to State Farm's "jurisdictional references," which list applicable insurance regulations and requirements for a particular state. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 502:5–504:15. The jurisdictional references for Washington list various insurance regulations and requirements for the state, including Wash. Admin. Code § 391. Trial Ex. 27; *see also* Trial Ex. 3.

Mr. Graff testified that State Farm claims specialists also received Autosource-specific training. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 522:2–523:8. Thus, Audatex provided State Farm an Audatex "Job Aid," which described how to use the Autosource product as well as support phone numbers and procedures for when claims handlers required assistance with the tool. *Id.* at 522:2–523:8; *see also* Trial Ex. 26.

b. *State Farm's Relationship with Audatex*

According to Mr. Graff, State Farm had been using Autosource in some form in Washington since the late 1980s or early 1990s. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 477:12–24. Mr. Graff also testified that he was unaware of any Washington OIC complaints relating to the Autosource methodology from the time he became a consultant, around 2011, until 2015. *Id.* at 469:13–480:13.

According to Mr. Graff, during the class period, State Farm's and Audatex's relationship was governed by a Master Estimatics Services and Licensing Agreement, signed in 2015. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 492:24–494:7; *see also* Trial Ex. 41. That contract came about because of a "request for proposal" process, in which State Farm sent requests for proposals to three vendors—Audatex, CCC, and Mitchell—for nationwide valuation and estimation services. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 487:3–488:2, 489:12–491:9. The purpose of this request-

for-proposal process, according to Mr. Graff, was to ensure State Farm was contracting with vendors that provide "efficient, accurate, timely and price-competitive services." *Id.* 491:6–9.

The Master Estimatics Services and Licensing Agreement stated that "[if] as a result of any state or federal statute, regulation, regulatory order, or judicial decision STATE FARM's use of the Services or Software [i.e., Autosource] is in violation of such statute, regulation, regulatory order, or judicial decision as reasonably determined by STATE FARM," then Audatex would either attempt to procure State Farm the right to continue using the services or software or modify them, which if unsuccessful would then give State Farm the right to terminate the agreement. Trial Ex. 41 § 3.c. According to Mr. Graff, he personally understood this provision, in his role as claim consultant with supervisory oversight of State Farm's total loss operations, as a representation from Audatex that it "would comply with and meet state regulations and requirements" and provided "options and remedies if there was an issue." Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 495:14–496:1; *see also* Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 607:10–608:14. When asked on cross-examination whether this language put the responsibility on State Farm to evaluate compliance with state laws, Mr. Graff stated that he understood either State Farm "or the vendor" might identify compliance issues, in which case State Farm would work to address the issues and, if necessary, activate the contract's remedies. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 606:17–608:14. From 2015 to 2020, during the time Mr. Graff had supervisory responsibility for State Farm's total loss segment, Audatex never notified Mr. Graff that its Autosource valuation product was found noncompliant in Washington or in any other state. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 496:3–497:10.

In addition, the Audatex Job Aid states that "Autosource provides a value that is compliant with the Department of Insurance (DOI) regulatory guidelines based on the zip code provided for the loss vehicle." Trial Ex. 26 at 2. Further, the Audatex Job Aid provides a "complete list of DOI

approved methodologies by state," under which the "Multiple Comparable Report" methodology is listed for Washington as approved. Trial Ex. 26 at 2, 6. Mr. Graff testified that he believed these representations to be true based on Audatex's statements in these and other documents, the fact that the typical negotiation adjustment has been part of the Autosource valuation methodology for "decades" and no issues had been raised, and the quality of the product, which—according to Mr. Graff—State Farm verified through its own internal studies. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 523:13–524:2. Mr. Graff also noted that Autosource had never, to his knowledge, been disapproved as a vehicle valuation methodology in any state that requires formal approval. *Id.* at 483:23–484:19; Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 596:10–19.

Mr. Graff testified that, in his experience, "the used car market is a marketplace where people negotiate." Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 524:11–8. Accordingly, Mr. Graff stated, in his opinion, "the typical negotiation adjustment … is designed to replicate the common behavior in the used car marketplace." *Id.*

c. *State Farm's Knowledge of the Autosource Methodology*

Mr. Graff testified that, during the class period, he had a "functional[]" but not "forensic" understanding of the Autosource methodology. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 447:21–25. He also testified generally about the function of the typical negotiation adjustment. *Id.* at 533:4–535:10. However, Mr. Graff also testified that State Farm had never conducted an internal analysis of whether the Autosource valuation methodology, and specifically the typical negotiation adjustment, complied with Wash. Admin. Code § 391, explaining that conducting such a study is "not something that we would do in our normal practice[.]" *Id.* at 531:22–532:10. Instead, Mr. Graff stated that State Farm would typically rely on the expertise of its vendors and expect them to be in compliance. He testified, State Farm is "hiring them for their expertise and their responsibility and accountability." *Id.* at 532:25–533:3.

According, to Mr. Graff, State Farm did conduct two internal "cost valuation" studies comparing Autosource values to those generated by Audatex's largest competitor, CCC, which uses a valuation methodology that doesn't include a typical negotiation adjustment. In August 2017, a study comparing total loss vehicle valuations of 500 vehicles determined that Autosource valuations were on average 9.3% higher than CCC valuations. Trial Ex. 501. And in December 2019, a study comparing total loss vehicle valuations of 1,500 vehicles determined that Autosource valuations were on average 4.1% higher than CCC valuations. Trial Ex. 502. Mr. Graff could not testify to the truth or accuracy of these studies (and the Court did not admit them for that purpose), but he did testify that they occurred. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 523:19–524:2, 526:6–13, 529:13–531:3.

Finally, Mr. Graff explained that, after this Court granted class certification, State Farm stopped using typical negotiation adjustments in Washington. Beginning on September 13, 2021, State Farm claims handlers began a process under which they would manually add typical negotiation adjustments back to Autosource vehicle valuations, and then paid this "Washington Only Value" to settle total loss claims. Trial Tr., April 8, 2026 (Dkt. No. 526), 537:4–540:9; *see also* Tr. Exs. 508, 509, 510. This process lasted only several weeks, because State Farm then transitioned to using CCC valuations, which do not use typical negotiation adjustments, in Washington as of October 2021. This transition was national in scope and, according to Mr. Graff, stemmed from a request-for-proposal process that began in 2019, not this litigation. *Id.* 537:4–540:9, 548:25–549:14; *see also* Trial Ex. 31.

2. <u>Neal Lowell</u>

Mr. Lowell is a former Vice President of Product Management at Audatex. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 616:25–617:15. From 2017 until 2020, Mr. Lowell had "direct ownership" over the Autosource product, meaning he and his team were responsible for its development. *Id.*

at 618:14–20. His testimony began by explaining Audatex's understanding of the terms "actual cash value" and "fair market value," which the Autosource methodology treats synonymously to estimate a price at which "a willing seller would sell a vehicle to a willing buyer." *Id.* at 619:2–14. Mr. Lowell also testified that the Autosource product "is designed and intended to be compliant in all states," and as examples Mr. Lowell explained that the Autosource methodology is configured to conform to unique state regulatory requirements, such as specific temporal and geographic restrictions. *Id.* at 619:15–620:4. On cross-examination, Mr. Lowell agreed, however, that compliance is ultimately up to the insurer as the regulated entity. *Id.* at 642:7–11. Mr. Lowell knew nothing about communications between Audatex and the Washington OIC, or Audatex and State Farm, relating to regulatory compliance issues, which Mr. Lowell testified would be handled by Audatex's regulatory compliance department and Diane Klund. *Id.* 650:11–651:15; *see also id.* 661:8–22.

As for the overall valuation methodology, Mr. Lowell testified that the Autosource valuation process begins after a car is declared a total loss. The insurance company customer collects information about the totaled car, including its year, make, and model, and also inspects it to assess its pre-accident condition. With that information collected and inputted, Autosource then searches its database of roughly 70 million records—which is continually refreshed—for cars with the same year, make, model, and fuel type of the loss vehicle. The data undergoes various quality control mechanisms, such as excluding advertisements for vehicles in rough shape or that are outliers in terms of advertised price. From this database, Autosource searches for a minimum number of comparable vehicles available in the local market within 90 days after the loss and selects the "most comparable vehicles." Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 621:4–625:22.

The database, however, primarily contains advertised prices, which according to Mr. Lowell is necessary because Autosource must find comparable vehicles available within 90 days

of the date of loss to meet Washington regulatory requirements, and the database will not have a large record of sold prices available. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 627:5–25.

Rather than rely on the advertised prices themselves, Autosource usually applies a "typical negotiation adjustment" to the advertised prices to estimate a valuation of the comparable vehicles because "actual cash value" or "fair market value" is "what a vehicle would sell for, not what a vehicle would advertise for." Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 628:4–8. Put differently, the typical negotiation adjustment is intended to "normaliz[e] any sold values that we have with any advertised values." *Id.* at 628:9–11. Autosource, however, does not apply a typical negotiation adjustment to a comparable vehicle advertised for sale by a known "no haggle" dealer, such as Carmax, where the advertised price and sale price are presumably identical. *Id.* at 637:12–638:11. Nor does it apply the adjustment to actual sales prices in its database. *Id.* at 637:12–17.

Mr. Lowell testified that, to calculate the negotiation adjustment, Audatex conducts a statistical analysis twice a year, which is intended to account for any market fluctuations, and which involves analyzing hundreds of thousands of vehicle records. The analysis matches a sample of advertised asking prices of vehicles to their actual sold prices to measure the difference between the asking price and the final selling price. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 633:17–634:2, 635:9–14. These matched asking and sold prices are then separated into "price bands"—that is, ranges of advertised prices—for which Audatex separately calculates the typical negotiation adjustment for vehicles falling into each discrete price band. Mr. Lowell testified that the "price bands" indirectly account for vehicle make, model, and year, although he had seen no reason to believe those attributes are relevant to the calculation. *Id.* at 634:3–17; *see also* Trial Ex. 1.

After applying the typical negotiation adjustment to estimate a fair market value of the comparable vehicle, Autosource adjusts the value of the comparable vehicle to account for

differences in options and mileage between the comparable vehicle and the totaled vehicle. Autosource then makes further adjustments to account for differences in vehicle condition. If the totaled vehicle is in above-average condition, Autosource adjusts the value up; if it's in worse-than-average condition, the value goes down. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 628:25–632:13. On the condition adjustment specifically, Mr. Lowell testified that although vehicles on dealer lots are "prepped" for resale and are generally in superior condition to an "average" consumer vehicle, Autosource assumes that all comparable vehicles, almost all of which are dealer-prepped vehicles for sale on dealer lots, are in "consumer average condition," which is an assumption that benefits the consumer. *Id.* at 631:20–632:6.

Altogether, these calculations yield an Autosource report with an initial estimate of the actual cash value of the totaled vehicle, which the insurance company customer then uses in attempting to settle total loss claims. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 632:23–633:6.

3. <u>Diane Klund</u>

Ms. Klund is the Director of Regulatory and Government Affairs at Audatex, a role she has had since 2013. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 654:21–655:7. Before that, Ms. Klund was the Manager of Regulatory Compliance, a role with similar responsibilities. *Id.* at 655:8–14. In these roles, Ms. Klund's job is to ensure that Audatex's Autosource product complies with the laws and regulations in all states where Autosource is used, including Washington. *Id.* at 654:21–655:5. To that end, Ms. Klund attends seminars, participates in regulatory rulemakings, works directly with insurance company customers to address questions, concerns, or regulatory complaints about Autosource, and regularly meets with insurance regulators. *Id.* at 655:15–656:17, 669:12–672:22.

For example, Ms. Klund attends the Insurance Regulatory Examiners Society conference once a year, which provides opportunities to interact with state regulators, and Ms. Klund

participated in the two-year rulemaking that led to the enactment of Wash. Admin. Code § 391 in 2009, along with other industry stakeholders. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 669:18–672:22, 674:9–13. As for Ms. Klund's interactions with insurance company customers, she described two scenarios in which she provides assistance: (1) she helps answer questions from insurance company customers about regulatory compliance issues generally, and (2) she assists insurance company customers in responding to state insurance regulators asking about consumer complaints, including complaints that the Autosource valuation methodology does not comply with state insurance regulations. *Id.* at 656:4–657:7, 657:18–658:6. Ms. Klund also testified to having an "open line of communication" with Audatex's insurance company customers, including, specifically, Mr. Graff. *Id.* at 656:18–657:17.

Ms. Klund's meetings with insurance regulators generally occur pursuant to either a formal or informal approval process. She testified that seven states require "formal approval" of a particular valuation vendor, such as Autosource, and the remaining jurisdictions do not. That said, Ms. Klund testified that, regardless of whether approval is formal or informal, her process is generally the same: she meets with insurance regulators, explains how the Autosource methodology works, and explains how it complies with the state's insurance regulations, with the only difference being that a formal approval process results in a formal approval letter. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 672:23–674:8. According to Ms. Klund, the goal is always to come away from the meeting with an understanding that Autosource's valuation methodology complies with applicable state insurance regulations. *Id.* at 673:20–674:8.

In doing this work, Ms. Klund testified that she needs to have a detailed understanding of the Autosource methodology so she can explain to state regulators how that methodology complies with state insurance regulations. In other words, according to Ms. Klund, the "foundational" aspect of her job is to ensure that state insurance regulators understand how the Autosource

valuation methodology works and how it complies with state insurance regulations. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 661:23–663:1, 664:1–8. As for the typical negotiation adjustment in particular, Ms. Klund stated that it's a "core part of our methodology" and it is her "standard practice" to explain that adjustment to regulators. *Id.* at 664:10–24.

Ms. Klund also described her regulatory compliance efforts in Washington specifically. She testified that, during the two-year regulatory rulemaking that resulted in Wash. Admin. Code § 391, no regulator ever raised a concern regarding the typical negotiation adjustment. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 674:11–675:6. This did not surprise Ms. Klund, she explained, because she had attended several meetings with Washington insurance regulators since 2004 in which she would walk through an Autosource valuation with the regulator and, based on those meetings, she had no reason to believe there were any concerns about the typical negotiation adjustment. *Id.* at 676:3–17.

On February 17, 2010, after the enactment of Wash. Admin. Code § 391, Audatex representatives, including Ms. Klund, met with Washington OIC representatives Fritz Denzer, a consumer advocacy supervisor, and April Findley, a compliance analyst. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 685:15–686:19; *see also* Trial Exs. 504, 506. These individuals were, according to Ms. Klund, the OIC regulators responsible for ensuring that valuation methodologies used in Washington complied with Wash. Admin. Code § 391. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 686:10–19. At that meeting, Ms. Klund gave a PowerPoint presentation explaining the Autosource valuation methodology, which largely addressed compliance with the geographic and temporal requirements of Wash. Admin. Code § 391—the main focus of the Washington OIC at that time, according to Ms. Klund. *Id.* at 678:19–679:7; Trial Ex. 506. The presentation did not discuss the typical negotiation adjustment, however, which Ms. Klund said was "never at issue" but would have been addressed in her discussion of a sample Autosource report. Trial Tr., Apr. 9, 2026 (Dkt.

No. 359), 680:18–22; *see also* Trial Ex. 507. On cross-examination, Plaintiffs' counsel elicited that Ms. Klund could not independently recall whether Trial Exhibit 507 was the Autosource report she discussed with OIC in the 2010 meeting 16 years ago, but she assumed it was because it was the report OIC produced in discovery. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 713:18–714:4.

According to Ms. Klund, walking through a sample Autosource report was part of her "standard practice" when meeting with insurance regulators, Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 680:23–681:3, 681:15–682:7, the purpose of which was to ensure that, "if they have any concerns, we can address it with them up front," *id.* at 683:22–684:5. Ms. Klund discussed the sample Autosource report that she believed she had reviewed with regulators, *id.* at 714:1–4, which she said included a "pretty detailed explanation of where the data comes from, how much data is in the database, what the sources are, [and] where the information comes from," *id.* at 684:13–15, as well as a description of the typical negotiation adjustment, *id.* at 684:23–25. Specifically, the sample Autosource report explains that the "price listed for the vehicles is the asking price," that the "selling price may be substantially less," and that "[i]n order to arrive at an accurate fair market value, an adjustment of 4% has been applied to the average asking price of the vehicles," an adjustment the report explains is based on analyzing asking and selling prices. Trial Ex. 507 at 4. Ms. Klund testified she would have reviewed the description of the typical negotiation adjustment with Mr. Denzer and Ms. Findley, given that it's a "pretty important part." Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 684:23–685:3. Ms. Klund memorialized this meeting with a confirmation letter. *Id.* at 685:15–686:19; Trial Ex. 504. According to Ms. Klund, the Washington OIC never questioned the Autosource methodology and its compliance with Wash. Admin. Code § 391, either before, at, or after this meeting. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 686:20–687:2.

Ms. Klund testified that, since Wash. Admin. Code § 391's enactment in 2009, Audatex has processed more than 300,000 valuations in Washington using the Autosource valuation

methodology and, since 2010, she recalled only "two or three, three or four" instances where she has been contacted about a Washington consumer complaint related to the typical negotiation adjustment. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 687:10–688:2, 688:14–689:3. In those cases, if a complaint is raised by a consumer to a state insurance regulator, Ms. Klund testified that the regulator will then contact the insurance company, which will in turn contact Audatex, and specifically Ms. Klund, to provide a detailed response. *Id.* at 689:5–691:6. In responding, Ms. Klund stated she does her best to provide accurate information that reflects her discussions with regulators. *Id.* at 690:17–691:6.

Ms. Klund testified to two specific interactions with insurance company customers involving Washington OIC inquiries regarding the typical negotiation adjustment in 2017 and 2018. In both instances, Ms. Klund drafted responses for Audatex's insurance company customer explaining why typical negotiation adjustments complied with Wash. Admin. Code § 391. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 691:18–692:23, 693:18–697:14, 697:20–701:24. Trial Exs. 516, 517. Ms. Klund's responses, written in 2017 and 2018, explained her view that the typical negotiation adjustment complies with Wash. Admin. Code § 391(4)(b)—which specifies the deductions or additions an insurer may make to the value of a comparable vehicle "when determining comparability" to the loss vehicle. This is so, she explained, because the typical negotiation adjustment is not taken from the fair market value of the comparable vehicle to determine comparability to the loss vehicle, but from the advertised price of the comparable vehicle to determine its fair market value. Trial Exs. 516, 517. Ms. Klund also testified she never received any follow-up inquiries after providing her responses. Tr., Apr. 9, 2026 (Dkt. No. 359), 701:25–703:8. In Ms. Klund's view, because the "typical negotiation adjustment is a core part of our methodology," if the Washington OIC had concerns, such concerns would have made their way to Audatex and to her. *Id.* at 702:22–703:8, 703:19–705:9. According to Ms. Klund, the

Washington OIC has never found a consumer complaint challenging the typical negotiation adjustment's compliance with Wash. Admin. Code § 391 to be justified. *Id.* at 705:5–9.

4. Other Evidence

State Farm also requested that the Court take judicial notice of *Zuern*, 2020 WL 2114502, which the Court granted. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 726:23–727:8. *Zuern* involved allegations similar to those Plaintiffs make here, including that an insurer's use of Autosource, and typical negotiation adjustments specifically, violated Wash. Admin. Code § 391. 2020 WL 2114502, at *1, *3–4. In that case, Magistrate Judge Peterson granted in part and denied in part the insurer defendant's motion to dismiss and agreed with the defendant's argument that the typical negotiation adjustment was not an adjustment, like adjustments for options, mileage, or condition, used "when determining comparability." *Id.* at *4–5; *see also* Wash. Admin. Code § 391(4)(b). Instead, to give effect to Washington's insurance regulations as a whole, which define "[a]ctual cash value" to mean "fair market value" (Wash. Admin. Code § 284-30-320(1)), which in turn means the price that "an informed buyer would willingly pay and an informed seller would accept," *DePhelps*, 65 P.3d at 1240, Judge Peterson held that the "typical negotiation adjustment is a tool utilized for determining the fair market value of a vehicle when only the list price of vehicles is available," and it "is not a deduction of the kind listed in Subsection 391(4)(b)." *Zuern*, 2020 WL 2114502, at *5. Judge Peterson did find, however, that the plaintiff in *Zuern* stated claims premised on allegations that the typical negotiation adjustment was not "itemized" and "verifiable" under Wash. Admin. Code § 391(4)(b). *Id.*

State Farm also counter-designated Plaintiffs' deposition designations.

**C. Witness Credibility**

In a bench trial, the Court is empowered to judge the credibility of the witnesses. *See Spokane Arcade, Inc. v. City of Spokane*, 75 F.3d 663, 665 (9th Cir. 1996). The Court generally

finds that all five witnesses who testified live at trial were credible. However, the Court finds the testimony of Mr. Graff, Mr. Lowell, and Ms. Klund particularly credible, and the testimony of Mr. Harber and Ms. Owen less so.

Mr. Harber and Ms. Owen each appeared to be honest, and their demeanor and behavior on the witness stand generally led the Court to believe they intended to testify truthfully on the subjects of appraisal standards and insurance standards and practices. For several reasons, however, the Court gives their testimony less weight. For one thing, Mr. Harber made several statements that strayed well outside his expertise in appraisal, including, for instance, engaging in unsupported speculation about State Farm's motives in communicating with the Washington OIC. Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 152:8–13. His statement that it would not matter to him how the Washington OIC evaluates the Autosource product because he could read the regulations and decide for himself whether the product is compliant also undermines Mr. Harber's credibility. *Id.* at 170:14–19. As for Ms. Owen, she was unable to identify any factual basis for several of her opinions. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 362:10–24, 367:2–369:21. She also repeatedly refused to answer questions about the basis for her expertise and opinions, citing privilege and confidentiality. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 327:24–328:15, 347:12–21, 348:3–16, 349:3–10; 350:24–351:4, 352:6–15, 353:5–12. Given this reticence—particularly in response to questions that were unlikely to involve genuinely privileged or confidential information—the Court gives Ms. Owen's opinions substantially less weight.

The Court found Mr. Graff, Mr. Lowell, and Ms. Klund to be particularly credible. Each witness's answers were complete and appeared to be honest, and their demeanor reinforced the Court's conclusion as to their credibility. Given the positions Mr. Graff held at State Farm, he was well positioned to speak to State Farm's claims handling practices, its relationship with Audatex, and its knowledge of the Autosource product. While Plaintiffs' counsel elicited from Mr. Graff

some minor corrections to previous testimony, these corrections appeared to be due to lapses in memory or oversight in searching Mr. Graff's emails during discovery, not lack of credibility. *See* Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 445:25–446:6. Likewise, Ms. Klund and Mr. Lowell were knowledgeable about the subjects to which they testified and appeared to do so fully and truthfully. While Ms. Klund could not remember some details from meetings with the Washington OIC that occurred over a decade ago, Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 713:18–25, this was unsurprising and did not undermine the credibility of her testimony concerning her "standard practice" in meetings such as this, *id.* at 664:10–24.

**D. Plaintiffs Have Failed to Meet Their Burden Under the CPA Factors**

Having summarized the evidence submitted at trial, the Court next turns to the CPA factors: whether enhanced damages are necessary to (1) fully compensate the injured consumers; (2) encourage private citizens to bring Washington CPA claims that benefit the public; (3) deter unlawful conduct; and (4) punish unlawful conduct. The Court addresses each factor in turn.

1. <u>Enhanced Damages Are Unnecessary to Fully Compensate the Injured Consumer.</u>

The first factor the Court may consider is whether enhanced damages are necessary to fully compensate the injured consumer. On July 29, 2025, Judge Pechman granted summary judgment in favor of the *Kelley* and *Jama* classes, finding that the typical negotiation adjustment violated Wash. Admin. Code § 391. Dkt. No. 272. The Court further held that this regulatory infraction violated the CPA and awarded actual damages of $33,979,240.07 for the *Kelley* class and $4,320,899.29 for the *Jama* class, representing the average amount of the typical negotiation adjustment (and increased sales tax) extrapolated to the entire class.

This Court finds the trial record devoid of evidence that enhanced damages are necessary to fully compensate class members. Neither Mr. Harber nor Ms. Owen testified to this factor, and

none of the proffered deposition testimony speaks to it either. Plaintiffs did not call any fact witnesses, including the named plaintiffs, to testify about any alleged under-compensation.

In their opposition to State Farm's motion for judgment on partial findings, Plaintiffs argue that State Farm is attempting to relitigate liability, and they argue that this Court has already held that "Plaintiffs and Class were injured in the amount taken for the negotiation deduction." Dkt. No. 355 at 4. But while Judge Pechman held that the *Kelley* and *Jama* classes were injured in the amount taken for the negotiation adjustment, the Court already awarded actual damages in the amount requested for that injury at summary judgment—more than $38 million. The question before this Court at trial is whether, in addition to the actual damages already awarded in the prior order, enhanced damages are necessary to fully compensate the *Kelley* and *Jama* classes. The Court finds they are not and that the class members are already fully compensated by the actual-damages award, which restores to them the full amounts of the challenged typical negotiation adjustments.[7] *See Innovative Sols. Int'l*, 2025 WL 949579, at *1–2.

In sum, the Court finds that enhanced damages are unnecessary to fully compensate any injured consumer. *See Innovative Sols. Int'l*, 2025 WL 949579, at *1–2.

2. Enhanced Damages Are Unnecessary to Encourage Private CPA Actions.

The second factor the Court may consider is whether enhanced damages are necessary to encourage private citizens to bring CPA claims. As with the first factor, the Court has again canvassed the evidence and found none bearing on it. Even assuming they would be qualified to do so, neither Mr. Harber nor Ms. Owen testified to this factor, and none of the deposition

[7] To the extent that Plaintiffs also argue that enhanced damages are necessary to account for the lost time-value of money, that argument amounts to an attempt to relitigate the prior rulings disallowing prejudgment interest. The Court reminds Plaintiffs that prejudgment interest is unavailable because Plaintiffs sought damages based on an aggregated estimate of average negotiation adjustments, which are unliquidated under Washington law. *See Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1047 (Wash. 2014). Plaintiffs cite no authority for the notion that, if parties are not entitled to prejudgment interest as a matter of law, their actual damages should be increased to give them what is effectively prejudgment interest in disguise.

designations speak to it either. And again, Plaintiffs called no fact witnesses, including the named plaintiffs, to testify about this factor. Plaintiffs also identified no evidence in their response to State Farm's motion for judgment on partial findings on this issue. *See* Dkt. No. 355 at 9. Plaintiffs briefly argue that the "relatively modest" size of each individual claim warrants enhanced damages to incentivize private lawsuits. *Id.* But the Court finds that the modest nature of individual claims compared to "aggregate harm" (*id.*) is adequately accounted for by rules permitting cases like this to proceed on a class action basis.

Further, the Court again refers to the prior order on summary judgment awarding the *Kelley* and *Jama* classes more than $38 million based on a violation of Wash. Admin. Code § 391 and thus the CPA. The Court finds that such a sizeable actual damages award is sufficient to encourage private citizens to bring CPA claims.

Accordingly, this Court finds that enhanced damages are unnecessary to encourage private citizens to bring CPA claims. *See Innovative Sols. Int'l*, 2025 WL 949579, at *2.

3. <u>Enhanced Damages Are Unnecessary to Deter Unlawful Conduct.</u>

The third factor the Court may consider is whether enhanced damages are necessary to deter unlawful conduct. On this issue, Plaintiffs first turn to Ms. Owen. She testified that State Farm violated industry standards when it continued to use Autosource (and typical negotiation adjustments) for ten months after this Court denied State Farm's motion to dismiss on November 9, 2020, characterizing that order as holding that the typical negotiation adjustment violated Wash. Admin. Code § 391 as a matter of law. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 310:1–16. As noted above, the Court is disinclined to give substantial weight to Ms. Owen's testimony, particularly insofar as it borders on an impermissible legal opinion and attempts to interpret the nature and effect of prior orders in this litigation.

The Court also rejects Plaintiffs' argument that the prior order on State Farm's motion to dismiss required State Farm to immediately cease applying the deduction. Rather, in that order, the Court rejected State Farm's argument that plaintiffs failed to state a claim because the typical negotiation adjustment was not an adjustment used "when determining comparability" under Wash. Admin. Code § 391(4)(b). Dkt. No. 49 at 12. That order was adjudicated under Rule 12(b)(6), which tests the sufficiency of the allegations. At that point, the Court did not finally adjudicate the merits of the dispute or foreclose summary judgment or further relief to State Farm. Rather, it was not until July 29, 2025—years after State Farm stopped using Autosource in Washington—that Judge Pechman granted summary judgment to Plaintiffs, ruling that the typical negotiation adjustment was contrary to Washington regulations.[8] Dkt. No. 272 at 13.

In addition, the Court finds it relevant that State Farm did take steps to stop using typical negotiation adjustments in Washington after the Court first granted certification on July 1, 2021. *See* Dkt. No. 136. About ten weeks later, beginning on September 13, 2021, State Farm stopped taking typical negotiation adjustments in Washington. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 538:2–540:9; Trial Exs. 508, 509, 510. Mr. Graff testified that, around that time, State Farm first engaged Audatex to develop a program to "turn[] off" the negotiation adjustment in Washington, which Audatex explained was impossible to do, absent significant software upgrades and financial investments. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 538:2–9; Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 638:16–639:17. And although the Autosource valuation methodology does not use typical negotiation adjustments in California based on a state-specific regulation that requires all insurers to use only "the asking price or actual sale price" of a comparable car when valuing totaled vehicles, Cal. Code Regs. tit. 10, § 2695.8(b)(2); *see also* Trial Tr., Apr. 9, 2026 (Dkt. No. 359),

[8] That Judge Peterson had in part adopted State Farm's position several months prior in *Zuern*, 2020 WL 2114502, further underscores the unsettled nature of the issue as of November 2020.

638:12–22, Mr. Lowell explained that such functionality did not exist for other states and other insurance carriers at that time. Rather, the California-specific methodology was "hardcoded," and Audatex could not turn off negotiation adjustments on a state-specific and carrier-specific basis until 2022—after State Farm had stopped using Autosource. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 638:12–639:17. Accordingly, State Farm developed a manual process, under which claims handlers added typical negotiation adjustments back to Autosource valuations to determine a "Washington Only Value." Tr. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 538:2–540:9; Trial Exs. 508, 509, 510. State Farm instituted this manual method even though it stopped using Autosource altogether in October 2021, as part of a years-long process where State Farm evaluated and hired a new valuation vendor. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 537:4–16, 548:25–549:14; *see also* Trial Ex. 31 (request for proposal response from Audatex dated October 2019).

The Court finds that State Farm's conduct in manually refunding negotiation adjustments soon after the Court's certification order, and even though State Farm was scheduled to stop using Autosource altogether several weeks later, is indicative of a proactive approach to comply with the law. It is not conduct suggesting that additional "deterrence," in the form of enhanced damages, is necessary.[9]

In sum, the Court finds that enhanced damages are unnecessary to deter unlawful conduct.

[9] The Court finds unpersuasive Plaintiffs' arguments that deterrence is warranted by State Farm's current use of valuation vendor CCC, which Plaintiffs describe as a "lowest-bid vendor," or by State Farm's "litigation history" and prior settlements in other cases. Dkt. No. 355 at 10. Plaintiffs have never based any of their claims on State Farm's use of CCC. Nor has it been a central issue in this case whether CCC's valuation methodology complies with Washington insurance regulations. Rather, State Farm's conduct here (i.e., using the typical negotiation adjustment) is the appropriate focus of the enhanced damages inquiry. The record reflects that State Farm took reasonably prompt steps to remove the typical negotiation deduction after the Court's class certification order and well before the Court ultimately granted summary judgment to Plaintiffs.

4. Enhanced Damages Are Unnecessary to Punish Unlawful Conduct.

The fourth factor the Court may consider is whether enhanced damages are necessary to punish unlawful conduct. In other words, this factor considers whether, and to what extent, enhanced damages are necessary to "punish wrong-doers." Dkt. No. 272 at 30. This factor necessarily overlaps, to some extent, with the third CPA factor. As discussed above, considering whether State Farm's conduct warrants punishment requires the Court to consider the reasonableness of State Farm's conduct in light of the facts and circumstances. Plaintiffs make several arguments as to why enhanced damages are necessary to punish State Farm. None are persuasive.

First, Plaintiffs argue that enhanced damages are necessary to punish State Farm because, as Mr. Harber testified, insureds are "often vulnerable" and under "duress" and have limited or no ability to negotiate the price of used cars following a total loss. State Farm takes advantage of this situation, Mr. Harber says, by disclosing the existence of rental car coverage that will be terminated three days after making a total loss settlement offer, which Plaintiffs say unduly pressures insureds into accepting "low-ball" total loss settlements. Dkt. No. 355 at 6.

Mr. Harber's testimony on these points amounted to little more than uncorroborated hearsay summaries of anecdotal conversations. Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 94:2–95:3. Although the Court granted Plaintiffs some leeway to develop this testimony, *id.* at 95:4–96:9, the Court finds that this testimony was unmoored to any admissible evidence. For example, Mr. Harber did not identify a single State Farm insured—or any specific total loss—to support his opinion. And on cross-examination, Mr. Harber admitted that his opinions were based on his personal experience only, which necessarily involves situations where insureds are dissatisfied enough to seek out his services. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 227:5–229:2. Mr. Harber could not identify how that relatively limited group of dissatisfied insureds compared to the

broader group of insureds as a whole. *Id.* at 228:21–229:2. And again, Plaintiffs did not call any fact witnesses, including the named Plaintiffs themselves, to discuss their experiences navigating State Farm's total loss process. Given the absence of such testimony from any State Farm insured and the limits of Mr. Harber's experience in forming his opinions, the Court will not credit or rely on Mr. Harber's testimony, which is of arguable admissibility, *see* Fed. R. Evid. 702, and of little help to the Court regardless.

Regarding State Farm's disclosures to insureds about the limits of their rental car coverage, Mr. Harber acknowledged that insurance customers can buy rental car coverage as part of their automobile insurance policy, which has been approved by the Washington OIC. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 230:4–12. Mr. Harber also testified that he is "[un]aware of any evidence that State Farm cuts [rental car coverage] off" before it is allowed to do so. *Id.* at 232:12–14. And Mr. Harber testified on cross-examination that he would personally want the insurance company to disclose the remaining amount of available rental coverage to his clients. *Id.* at 229:22–230:2. The Court thus finds that State Farm's practice of disclosing the existence and limits of rental coverage is not inappropriate and will not punish State Farm for doing so.

Plaintiffs also argue that enhanced damages are necessary to punish State Farm because State Farm (i) actively conceals the negotiation adjustment from its insureds (either through "willful ignorance" or abject refusal to provide Autosource reports to insureds); (ii) discloses the typical negotiation adjustment only through an Autosource report that buries the adjustment in "fine print" and which requires some math to deduce; and (iii) refuses to "back out" the typical negotiation adjustment even when requested to do so.

On the first point, Plaintiffs again turn to Mr. Harber, who testified that State Farm claims handlers don't understand the negotiation adjustment and, when pressed to explain it, say it is "proprietary" and cannot be disclosed. Trial Tr., Apr. 6, 2026 (Dkt. No. 356), 108:9–12. Mr.

Graff, on the other hand, testified that claims handlers are trained on the Autosource methodology generally. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 522:2–523:8. In any event, while claims handlers, who number in the thousands, may not know all of the inner workings of Autosource's valuation methodology at a level comparable to Mr. Lowell's knowledge, the Court does not find this fact highly probative of whether enhanced damages are necessary to punish State Farm for unlawful conduct.

Ms. Owen also testified that, based on her review of three claim files (out of a total sample of 1,970), in only 2% of cases did an insured request the Autosource report from State Farm. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 304:1–4. Ms. Owen based this calculation on the original sample of 150 claim files (3 ÷ 150 = 0.02). Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 394:3–8. This testimony is neither reliable nor persuasive. After much back and forth at trial, Ms. Owen ultimately conceded that her opinion was based only on her review of the three claims files, and those three had been selected by Plaintiffs' counsel for her review. Trial Tr., Apr. 7, 2026 (Dkt. No. 357), 372:4–372:25, 373:10–25; Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 397:14–398:4. Ms. Owen is not qualified to offer statistical opinions about claim file sampling, nor could she competently or credibly testify that her 2% figure is representative of the whole. The Court finds Ms. Owen's testimony unreliable and insufficient to support an award of enhanced damages on this basis, even assuming she was qualified to offer it.

Plaintiffs also fault State Farm for the design of the Autosource report, which they say is difficult to understand and buries the negotiation adjustment in "fine print." Plaintiffs, however, have submitted no evidence that the design of the Autosource report was part of a scheme by State Farm to conceal the typical negotiation adjustment. Nor did Plaintiffs introduce any evidence from an insured who struggled to locate or understand the adjustment in the reports. Indeed, as noted above, Plaintiffs did not call a single class member to testify to their experience with the reports

or the adjustment in any respect. Plaintiffs rely solely on the argument of counsel. The Court has reviewed the Autosource reports in the record and does not find that their design makes the typical negotiation adjustment so inconspicuous as to suggest bad faith or otherwise merit punishment in the form of enhanced damages.

Next, Plaintiffs argue that State Farm's refusal to remove the typical negotiation adjustment, when an insured objected to its inclusion, reflects bad faith conduct that warrants enhanced damages. *See* Dkt. No. 355 at 6. Mr. Graff testified that State Farm's practice was not to remove the typical negotiation adjustment. Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 575:13–16. Instead, when the insured disagreed with the initial Autosource valuation, State Farm's claims handlers would either obtain additional Autosource reports with new comparables, escalate the claim to obtain a "dealer quote" report (as happened with Ms. Ngethpharat), or suggest appraisal. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 511:4–17. That State Farm chose to address policyholder concerns by suggesting different inputs to the Autosource valuation or alternative valuation methodologies, rather than manipulating the initial valuation to remove the typical negotiation adjustment, does not indicate bad faith or any other basis for enhanced damages.

And as for Plaintiffs' suggestion that appraisal is another method by which State Farm pressures insureds to settle at "low-ball" offers, the Court notes that Washington's insurance regulations expressly permit appraisal. Wash. Admin. Code § 391(3) ("Appraisal: If the first party claimant and the insurer fail to agree on the actual cash value of the loss vehicle and the insurance policy has an appraisal provision, either the insurer or the first party claimant may invoke the appraisal provision of the policy to resolve disputes concerning the actual cash value."). And Mr. Graff testified that State Farm always honors the highest value, regardless of valuation methodology or the order in which the value was obtained. Trial Tr., Apr. 8, 2026 (Dkt. No. 358), 468:3–13. In other words, if an appraisal (or another methodology permitted under the policy)

valued the totaled vehicle higher than the initial Autosource valuation, State Farm would pay the higher appraised value. *Id.* But if the appraised value was lower than the Autosource estimate, State Farm would pay its insured the Autosource amount. Considering this general approach to reaching an agreed value on an insured's vehicle, the Court finds that State Farm's policy against removing the typical negotiation adjustment does not support enhanced damages.

Finally, in considering the need for punishment, the Court finds it relevant that State Farm's interpretation of Wash. Admin. Code § 391—while ultimately rejected at summary judgment—is not without some purchase in the regulation's text. Wash. Admin. Code § 391(4)(b) requires insurers, "[w]hen settling a total loss vehicle claim[,]" to "[b]ase all offers on itemized and verifiable dollar amounts for vehicles that are currently available, or were available within ninety days of the date of loss, using appropriate deductions or additions for options, mileage or condition when determining comparability." In the summary judgment order, Judge Pechman held that the three listed deductions—for options, mileage, or condition—are the only deductions permitted in determining comparability. Dkt. No. 49 at 11–12, Dkt. No. 272 at 15.

State Farm's position during and before this litigation has been that the typical negotiation adjustment is nevertheless permitted because it is not an adjustment for determining comparability. Rather, Autosource applies the adjustment to the advertised price of comparable vehicles to determine each vehicle's actual cash value (or fair market value), which is the starting point *before* determining comparability. *See* Wash. Admin. Code § 391(2) (permitting insurers to settle total losses "based on the actual cash value of a comparable motor vehicle," minus any deductible). From that value, Autosource applies adjustments for options and mileage to account for differences between the comparable vehicle and the loss vehicle. And those values are then averaged and further adjusted based on the loss vehicle's condition. *See* Trial Tr., Apr. 9, 2026 (Dkt. No. 359), 626:5–632:13. Put differently, State Farm's position is that the typical negotiation adjustment is

not an adjustment for "determining comparability" because—unlike adjustments for condition, mileage, and options—its purpose is to estimate the value of an advertised vehicle, not to account for differences between the comparable vehicle and the loss vehicle.

As discussed, State Farm's position in this regard is consistent with *Zuern*, 2020 WL 2114502, at *5, a case decided months before the motion to dismiss order in this case. Considering that another Court in this District agreed with State Farm in construing the same regulatory text, the Court finds that interpreting Wash. Admin. Code § 391 is not so straightforward a task as to suggest bad faith on State Farm's part.[10]

In sum, the Court finds that enhanced damages are unnecessary to punish unlawful conduct.

## IV. CONCLUSION

Because none of the four enhanced damages factors favor Plaintiffs, the Court finds that Plaintiffs have failed to meet their burden of establishing entitlement to enhanced damages under the CPA in any amount.

Dated this 14th day of September, 2026.

Kymberly K. Evanson
United States District Judge

[10] *Zuern* (at the pleading stage) and this Court (at the pleading stage and summary judgment) also both held that the plaintiffs in each respective case adequately established that the typical negotiation adjustment is not "itemized and verifiable" under § 391(4)(b). 2020 WL 2114502, at *5; Dkt. No. 272 at 15 (explaining "there is nothing in the Autosource Report that would allow a consumer to know whether the amount attributed to this deduction is accurate or true"). State Farm's contrary construction of the regulation, however, was also not without intuitive appeal. The typical negotiation adjustments were disclosed, after all, on the Autosource reports. And a regulated entity or consumer reading the regulation could reasonably question whether the marginal difference in value of a used vehicle based on its "options," "mileage," or "condition" is any more capable of verification by an insured than the amount of the typical negotiation adjustment. State Farm was thus not unreasonable to interpret the "itemized and verifiable" requirement as applying to something *other* than the underlying valuation methodologies—such as the "dollar amounts" of advertised or sold vehicles "currently" or recently "available" nearby. *See* Wash. Admin. Code § 391(4)(b).